AUDITOR GENERAL *v.* PIONEER IRON CO.

TAXATION—FRAUDULENT ASSESSMENT ROLL—REMEDIES.

Where, on the hearing of objections to the petition of the auditor general for the sale of lands delinquent for taxes, it appeared that the assessor and board of review of a city intentionally omitted a large amount of personal property and real estate from the assessment roll, and greatly undervalued certain personal property and the business and residence property of the city, in order to throw a heavier burden of taxation on the outlying lands owned by the objectors, the entire roll was properly held void as to the latter; it not being incumbent upon them, in such case, to furnish the court with *data* from which to determine the amount they should equitably pay, which would practically involve the making of a new roll.

| | |
|---|---|
| 123 | 521 |
| 123 | 540 |
| 123 | 521 |
| s82NW | 260 |
| 129 | 185n |
| 129 | 186 |
| 123 | 521 |
| s82NW | 260 |
| 132 | 312 |
| 123 | 521 |
| 142 | 200 |
| 123 | 521 |
| 152 | 624 |

Appeal from Marquette; Stone, J. Submitted January 5, 1900. Decided March 27, 1900.

Petition by Roscoe D. Dix, auditor general, for the sale of lands delinquent for taxes: On objections filed by the Pioneer Iron Company and others. From a decree setting aside the taxes, petitioner appeals. Affirmed.

*Clark & Pearl*, for petitioner.

*George Hayden*, for defendants Pioneer Iron Co., Iron Cliffs Co., and Arctic Iron Co.

*S. W. Shaull* (*A. B. Eldredge*, of counsel), for defendants Negaunee Iron Co., Edward N. Breitung, and Frank Ross.

*Charles R. Brown & Son*, for defendants Pendill.

LONG, J. On the presentation of the petition of the auditor general for the sale of lands delinquent for taxes for 1896 to the circuit court, in chancery, of Marquette county, certain of the taxpayers of that county filed objections to the sale of the lands, alleging:

"*First*. In assessing personal property, the assessor put upon the roll only stocks of goods or stocks in trade of business concerns, houses built on leased lots, and called 'personal property,' and the stock of the First National Bank, and willfully omitted all other personal property in the city.

"*Second*. Large quantities of iron ore at the several mines in the city (naming them), worth at least $200,000, and being personal property, were not valued, and were willfully omitted from the roll.

"*Third*. All the horses, cows, and other personal property of this character, except the animals in livery stables, constituting an entire class of personal property, and of great value, were willfully omitted from the roll.

"*Fourth*. In this prosperous city, containing a population of 6,000, were great numbers of individual citizens having each large amounts of personal property owned individually, but, with the exception of two of the wealthy men, Samuel Mitchell and Alexander Maitland, these citizens, having large amounts of individual personal property liable to assessment, were willfully omitted from the roll; that, in the case of Mitchell and Maitland, they were put upon the roll for $300 and $200, respectively, amounts insignificant and puerile compared with their actual property, but the board of review willfully struck out even these values, and left the roll bare of this great class of personal property; that the assessor knew of all the personal property thus omitted, but willfully, designedly, and fraudulently omitted it; that the board of review knew of the willful, designed, and fraudulent omissions of the assessor, but not only concurred therein, but went further, and struck from the roll the names of the only two citizens of this large city who had been put upon the roll for individual personal property, all of which they did with full knowledge, willfully, designedly, and fraudulently; that these acts of the assessor and board of review were for the purpose of making objectors pay more than their just burden of taxes, and to relieve individual citizens of Negaunee of their just burdens.

"*Fifth*. The stocks of goods, houses on leased lots, and capital of the First National Bank, actually put upon the roll, were by both the assessor and board of review knowingly, willfully, and fraudulently, and for the same purpose above stated, grossly undervalued; the First National Bank, with a capital and surplus of $70,000, being put upon the roll for only $25,000.

"*Sixth.* The assessor willfully and deliberately established a classification between corporations owning wild, undeveloped lands in the city of Negaunee, popularly known in that city as 'fee-owning corporations,' on the one hand, and residents of Negaunee, on the other, and willfully and fraudulently, with intent to make the former class pay more than their just burden, and to relieve the latter class, grossly overvalued the lands of the objectors, who were of the former class, and grossly undervalued the resident real estate in the city; that the board of review, with like knowledge and intent, willfully and fraudulently, and knowing the conduct of the assessor, concurred therein, and did the same.

"*Seventh.* The assessor also established a different kind of classification, to wit, between the property of objectors, owning the said wild lands, on the one hand, and properties in the city of Negaunee known as 'working mines,' by which classification the assessor sought to be more lenient to the working mines, which employed men, and were a benefit to the city, than to the wild lands, which were not worked by their owners, and were of no benefit to the city. He also classified the owners of these properties, respectively, actuated by a dislike of the corporation fee owners (the objectors), by which he sought to make the lands of objectors pay more than their just and fair share of tax, and to punish them, and, on the other hand, to encourage the working-mine owners to spend money in the city, and to let their property off easy, and, in accordance with these classifications and these designs, knowingly, willfully, and fraudulently grossly overvalued the land of objectors, and grossly undervalued the working-mine properties.

"*Eighth.* The board of review, knowing the classifications made by the assessor, and his design therein, and his acts in accordance therewith, as so stated, knowingly, willfully, and fraudulently concurred therein, and did the same.

"*Ninth.* The effect of all these several acts was to put values upon the property of the objectors many times greater than its actual value, and on all the other property much less than its actual value, and by these acts, and by the omissions of property altogether, to create a grossly unequal valuation of the property of objectors, as compared with all the other property in the city of Negaunee, and to make the assessment roll void."

Some other objections were also made as to other matters, which the circuit court examined and passed upon. The matter was heard in open court, and at the conclusion of the testimony the court filed the following written opinion:

"Under the evidence in this case, I have reached the conclusion that no part of the tax assessed can be sustained, as to any of the parties filing objections. I have reached this conclusion with a great deal of reluctance, and with the case of *Pioneer Iron Co.* v. *City of Negaunee* [116 Mich. 430 (74 N. W. 700)] in mind. I do not in any way modify or change my holding in that case as to the law or the testimony adduced in that case, nor as to the law or facts found by me in that case. But, to my mind, the testimony in this case is much different than the testimony in that. It is much more far-reaching in its effects, as to the good faith of the assessing officer and the board of review in 1896. In fact, upon the argument in this case it may be said, from the considerations urged upon the court for the auditor general, that the only legitimate conclusion to be reached from those arguments is that fraud is conceded here on the part of these assessing officers,—if not fraud in fact, at least that it amounts to fraud in law.

"I shall spend no time in discussing the question as to whether any portion of the property of the objecting parties here has been overvalued by the assessor or assessing officers; and when I say 'assessing officers' I mean the board of review. It is very evident from the testimony in this case that the board and the assessor sought at least to transfer the assessment upon the property in the city of Negaunee from the resident portion thereof to the property of the companies, known as the 'outlying lands.' Whether in doing this they assessed these properties (that is, the outlying lands) too high, is not a matter of any importance now to the court, because I am thoroughly satisfied from the evidence, and can reach no other conclusion, that, if they did not assess this property too high, they undervalued and omitted from the roll large amounts of both real and personal property belonging to residents of the city of Negaunee. The result was an unequal burden. I have found that there was omitted from the roll a considerable amount of real property. As an illustration, take the seven forties in section 9, assessed at only $300

apiece, while the surrounding properties vary from $1,000 to $4,000 each in assessment. The only excuse that can be found for this is to say that the surface value only (that is, the surface only) was valued or assessed by the assessor; and they have left off then, and omitted from the assessment, the mineral value of those seven forties,—for the evidence is undisputed that these properties thus omitted (the forties) were worth as much as, if not more than, the adjoining forties. Now, it was the duty of the assessor to have assessed those forties, and to have assessed the entire of them. The tax should be upon the land, and it included the whole estate, whether surface or mineral interest. *Fletcher* v. *Township of Alcona,* 72 Mich. 18 (40 N. W. 36). So here was a large amount of property, amounting to at least $25,000, that was entirely omitted,—of real estate,—and not assessed. You go a little further, and look at the mining properties that were in actual operation there, and in that you may take the Nagaunee mine, and the other mines of about equal value, to wit, the Queen group, and the Cambria and the Lillie; and the testimony is undisputed that those mines were worth at least $250,000 apiece, while they were assessed for about one-third; one of them assessed at $98,000, and I do not recollect the exact figures of the others, but the record will show,—at about one-third. There was the omission, then, of from $400,000 to $500,000 of real estate, by undervaluation.

"Then, coming to the question of the personal property entirely omitted from the roll, you have the personal property of the mining companies, including the stock piles,—property that was worth, we will say, at least $600,000 and upwards,—that was entirely omitted. Now, this cannot be overlooked,—the omission of such large quantities of personal property that is visible. If it were necessary for me to say anything about it, I would say that there is much more force in saying that the real estate of the objecting parties here may not have been overvalued than there is reason for saying that there is any excuse for this omission. There may be in the judgment of honest men, of equal intelligence, a great deal of conflict as to the value of property in a mining district. The ore is hidden away in the ground. Men may differ in their judgment with reference to it. But when you come to large quantities of pine timber, or lumber, or sawlogs, or ore piles, that are visible to the naked eye of the assessing officer, it is unlawful and unpardonable for them to be omitted from

the assessment roll. Then take the stocks of goods in that city. The testimony of the assessor himself shows that his own stock of goods, or the stock in which he was interested, was valued at about one-quarter of its cash value, as stated by him here as a witness; and his testimony is that that rule prevailed generally through the assessing district. The same rule will apply, perhaps in a different ratio, as to the real estate of the residents of the city. His own home, which he says was worth $1,800, was assessed by him at $600,—just one-third the amount,—and his testimony is that that rule prevailed generally as to the residence property; and we have had other illustrations of it by other testimony in the case. We have had in evidence 76 photographs of different pieces of property, consisting of residence and business property, with the testimony of witnesses as to their value. Now, if that were all, we would not bandy words here because an assessing officer had assessed property lower than somebody else said was correct, for the reason that an assessing officer might do that in the exercise of the best judgment he could bring to it; but when you have the assessing officer himself confessing that as to his own property, and all this property, that was about the ratio, it presents a very different case. It is very remarkable, too, that the personal property of citizens is left off,—men like Samuel Mitchell and Mr. Maitland, known to be wealthy. And especially in the case of Mr. Mitchell. It appears by his own testimony that he had at least $50,000 worth of personal property assessable in that city at that time. It is entirely left off, showing an omission. Then the difficulty that has struck the court more forcibly than anything else was the leaving off of certain classes of property entirely. An inspection of the entire roll shows there is not an assessment of personal property upon it, outside of certain stocks of goods, and some houses, assessed as personal property, upon leased lands. In other words, no furniture, vehicles, horses, cattle, watches, jewelry, musical instruments, or anything of that kind. And one of the objections raised this point,—that there was entirely omitted this class of property. It is no answer to say that these classes have always been omitted.

"All through the discussion of this case, and examination of the testimony, there has been a struggle on the part of the court to try and maintain the taxation,—that these objecting parties should not escape some taxation. The court has tried to figure out a basis upon which it

could say that these objecting parties should pay a fractional portion of their tax, at least. But the testimony showing that certain classes of property was entirely omitted, the value and quantity of which does not appear, has rendered this impossible, unless the court is simply to guess at it. In other words, the assessing officers have so thrown this roll out of joint, and have so shuffled the assessments of the property in that city, leaving off large quantities of personal property entirely, that I find it impossible to do anything better than to guess at it. And I do not think it is the duty of the court to attempt to make a new assessment roll. In all the cases where our courts have apportioned the tax, it has appeared that some distinct portion of the property has been omitted, which did not affect the remainder of the roll. The difficulty here was, it seems to me, from the evidence in the case, that they assessed the outlying properties at least at their cash value, and took off from other properties the amount of tax they placed upon these. It is remarkable, if you will compare the roll of 1896 with the roll of 1895, that the assessed valuation is almost the same; and yet you find in all these outlying lands property raised from $300 to $10,000, or $8,000, $4,000, $3,000. And yet the aggregate of the valuation is about the same as the year before. So, at least, there was an unequal burden placed upon these properties, and upon all of the objecting parties here. This amounts, in my judgment, to fraud,—fraud in the law, at least. That this property of the objecting parties had been assessed in prior years too low may be true; and had these assessing officers simply gone on, and raised these valuations to a sum that would have been reasonable, without cutting down and leaving off large amounts of other property, the tax might have been sustained.

"There are numerous other questions in the case that it does not become necessary for the court to speak about, although I should hold, and shall be obliged to hold until the Supreme Court sets me right,—and I hope the assessing officers will govern themselves accordingly, if they think that the law is as announced by the court, at least, —that properties that are assessed which are crossed by railroads should not be assessed as one parcel, without any reference to the railroad. The railroads and other roads are exempt, of course; but that the railroad company crossing a forty acres is the owner or occupant of that part of that forty cannot be disputed, and the assess-

ment should be made with reference to it. There should be excepted from these assessments the rights of way of the railroad companies. Whether, in such case, where there is a mineral reservation, the remainder of the forty or eighty may be assessed as one parcel, with that exception, is a question that I am not clear about. It probably would be safer to assess that portion of the forty lying east or west or north or south of the railroad, as the case may be, separately, treating them as separate parcels of land; there being another owner or occupant coming in between. But, at all events, they should except the right of way of the railroad company. This seems to be recognized, and you will find a collection of authorities in 25 Am. & Eng. Enc. Law, 222, and following pages. This is the doctrine: That an assessment as one tract, of two adjoining parcels of different occupants, is void. Now, that the railroad company is an occupant of this land there can be no question, and therefore they should not be assessed as one parcel. Also, on page 651, Id., there are some authorities upon that same question. And, turning to this tax compilation of the general tax law sent out by the auditor general, this seems to recognize the same rule, for you find this rule laid down: 'If there is exempt property within the area described,—for instance, if a railroad crosses the land, or a school-house site is located thereon, —the exception must be distinctly designated and the acreage assessed correctly stated.' It is certainly safer to treat them as different parcels. So I should hold, were it necessary to hold, that any portion of this property crossed by the right of way of any of the railroad companies shown by the evidence to traverse these lands cannot be taxed as one parcel, and should be marked off for that reason alone.

" In the case of the objections filed by Flavia M. T. Pendill and others, there are numerous other questions as to the assessment of property in blocks and lots. Am I correct in saying that all these lots were assessed as one parcel?

"*Judge Brown:* Yes; they are all assessed together.

"*Mr. Bell:* Yes; they were assessed together in every instance.

"*The Court:* The evidence shows that in some of these blocks there are other owners coming right in with property, taking two or three lots, entirely disconnecting the remainder of the block,—as to the Brewing Company, for instance, coming right in. Take the block from lot 88 to

198, we will say. There is the Peninsula Brewing Company, with its brewery and house and barn, entirely disconnecting the remainder of the property, and yet it is assessed together. Dropping down to the lower end, to lot 198 and adjoining lots, the same thing is true. The same is true as to numerous other instances in this block. There are different occupants. I think it is not true as to any other ownerships, but as to occupants there are many different ones.

"Now, take the other objections filed by the Pendills. I hoped for a time to be able to maintain the taxes, but I find I cannot do so. The S. W. $\frac{1}{4}$ of the S. W. $\frac{1}{4}$ of section 6 and the N. W. $\frac{1}{4}$ of the N. W. $\frac{1}{4}$ of section 7 are assessed together, which is an anomaly. I never saw before, in all my experience in the State of Michigan, an assessment roll where unoccupied or nonresident properties upon different sections were assessed together. But that is not the thing that troubles the court most, because upon that portion of property there is about an equal acreage (happens to be) in these two forties, which are fractional,—37.28 acres each. And, if the only trouble was that, we might say we will separate them,—separate the tax. But on that portion of section 6 is the railroad question. Now, if the railroad renders the assessment of section 6 void, how can I apportion, as between 6 and 7? For the railroad must come out of section 6 anyway, and how much more? I do not know how much more was allowed for it, whether anything or not, or whether section 7 is of the same value as that north of the railroad on 6, or south of the railroad on 6. Ordinarily I would say that pieces of land that may be assessed together the court would presume were of equal value; but I do not think that rule would be a safe one to apply where there was a railroad upon one of them, which renders the assessment void upon that, and therefore I cannot say what part should go on section 7. I am speaking of this without reference to this question of fraud. The question of fraud disposes of the whole case, but I mention these others to show the mind of the court upon them.

"So I end as I began, recognizing the doctrine laid down by me in the case of *Pioneer Iron Co.* v. *City of Negaunee* as stating the law correctly. I think the evidence in this case shows an intentional omission of personal property, an intentional undervaluation of a large part of the personal and real estate, and an inten-

tional omission of real estate; not accidental, not inadvertency, as the Supreme Court use the word in one case, but known and intentional,—the object and purpose being to throw a larger taxation upon this class of outlying property, and to aid and benefit the working properties and the residence properties; thus discriminating, and not placing the assessment upon the question of valuations at all, but attempting to carry out a scheme that has, in my judgment, rendered this whole roll void as to those filing objections. I am very sorry to wipe out these taxes. There has not been a question before me, perhaps, in years, that I have struggled more with than with this question, to try to maintain some portion of this tax; but I have reached the conclusion that, when the assessing officers of a city will be so reckless and will so disregard their duty as they have in this instance, a court of equity cannot be expected to do impossibilities, and make an assessment roll out of such a jumble as they have made in this assessment. These taxes will be marked off. There will be no costs awarded in the matter."

A decree was filed in accordance with the opinion, from which the auditor general appeals.

It is contended by counsel for the auditor general that the court below was in error in setting aside the whole roll, and that it will be not only disastrous to the public revenues, but a dangerous precedent. It is evident that the learned circuit judge who heard and decided the case was as much distressed over the result reached as counsel, and yet that court found no way to avoid the difficulties.

Counsel, however, contend that it was the duty of the objectors to have furnished the court below with the *data* from which it could have ascertained the amount which the objectors should equitably pay. We know of no such rule, even were it possible to furnish such *data* in the present case. It is true that where a landowner invokes the aid of a court of equity to restrain the collection of a tax which, on his own showing, is void only in part and is valid in part, he must point out that which is invalid, and pay that which is valid. *Conway* v. *Waverly Township Board*, 15 Mich. 259. If such burdens were to be cast upon those objecting to such invalid and fraud-

ulent tax rolls, the requirements would necessarily involve the making of entirely new tax rolls by them.   The main difficulty in the present case is that no one, except the assessing officer and board of review, has the power to ascertain the *data* from which such tax rolls can be made; and the court below finds that they intentionally omitted personal property, and intentionally undervalued a large part of the personal and real property, and intentionally omitted certain real estate, "the object and purpose being to throw a larger taxation upon this class of outlying property, and to aid and benefit the working properties and the residence properties; thus discriminating, and not placing the assessment upon the question of valuations at all, but attempting to carry out a scheme."   We think the proofs fully sustain the finding of the circuit judge, and we see no way in which a different result could be reached.

It is confessed that it would be unjust and inequitable to compel the objectors to pay the amounts which they are respectively assessed.   How much shall they pay ?   Counsel for the auditor general are not able to compute the amount; nor do they give the court any *data* from which it could be ascertained, except to say that "the objectors were only entitled to such reduction as they have shown was unjust and inequitable."   We might say that they were each charged in this roll 50 per cent. too much, or 75 per cent. too much; but, as said by the court below, it would be a mere guess.   We think it is better that this county suffer the penalty for such wrong-doing of its tax-ing officers, than that the court should, by a mere guess, attempt to grant the relief to which the parties are entitled. The case is not like the cases of *Walsh* v. *King*, 74 Mich. 350 (41 N. W. 1080), and *Merrill* v. *Auditor General*, 24 Mich. 170, or the other cases cited by the learned coun-sel for the auditor general.   In most of the cases cited, the court found there was an honest mistake by the assess-ing officer, and in other cases it was said that, even where there was a fraudulent assessment, the court could grant relief by a reduction of the excess of tax; but in each case

cited where that was done the court had some basis by which the proper reduction could be made.    In the present case none is found, and it is apparent that none can be found without making new rolls.    *Walsh* v. *King, supra; Solomon* v. *Township of Oscoda,* 77 Mich. 365 (43 N. W. 990); *Auditor General* v. *Prescott,* 94 Mich. 190 (53 N. W. 1058).   ·

The decree below must be affirmed.

MONTGOMERY, C. J., HOOKER and MOORE, JJ., concurred.    GRANT, J., did not sit.