NEWPORT MINING CO. *v.* CITY OF IRONWOOD.

1. TAXATION — ASSESSMENTS — MINES AND MINING—VALUATION— METHOD—FINLAY SYSTEM.

   In making an assessment of the property of the Newport Mining Company, the board of State tax commissioners were warranted in employing as one of the bases of valuation the Finlay method of appraisal; except for fraud or on the ground that a fundamentally wrong principle was adopted the court will not set aside an appraisal made by the State tax commission in fixing the valuation of mining property.

2. SAME—MINERALS—VALUATION.

   And the State board was entitled to consider, in appraising the value of property, the methods of valuation which prevail in the business of mining.

3. SAME—ROYALTIES—EVIDENCE.

   In appraising the value of a mine, the State is not bound to accept as conclusive the amount of royalty which the land owner receives, since it frequently occurs that the lessor does not receive the full value, and the mine makes a profit in excess of the royalty fixed in the lease.

4. SAME—LOW VALUATION—FAILURE TO ASSESS OTHER PROPERTY AT SUFFICIENT RATE.

   The objection made by the complainant mining company that other property was assessed at less than its true value, and that complainant's property was relatively overvalued, was not a sufficient reason to declare the assessment invalid, in the absence of sufficient proof of fraudulent action by the board of tax commissioners.

5. SAME—EQUALITY—VALID ASSESSMENT—BURDEN OF PROOF.

   Although equality in assessments may not be absolutely attained, fraudulent or intentional inequality in valuations and assessments avoid the tax; and upon consideration of the evidence it is *held*, in an action to recover back taxes paid, that plaintiff did not sustain the burden of showing that the entire tax was fraudulent and void as claimed, because nonmining property was assessed at less than its cash value while mining property was appraised at its full cash value.

Error to Gogebic; Cooper, J. Submitted November 14, 1913. (Docket No. 124.) Decided June 7, 1915.

Assumpsit by Newport Mining Company against the city of Ironwood for the recovery back of taxes paid under protest. Judgment for defendant on a directed verdict. Plaintiff brings error. Affirmed.

*C. W. Westerman, Flanders, Bottum, Fawsett & Bottum, Dan H. Ball,* and *Edward G. Wilmer,* for appellant.

*Charles M. Humphrey,* for appellee.

*Grant Fellows,* Attorney General, *amicus curiæ.*

By section 7, art. 10, of the Constitution it is provided that "all assessments hereafter authorized shall be on property at its cash value;" in section 27 of the tax law (Act No. 206, Pub. Acts 1893), that:

"The words 'cash value,' whenever used in this act, shall be held to mean the usual selling price at the place where the property to which the term is applied shall be at the time of assessment, being the price which could be obtained therefor at private sale, and not at forced or auction sale. In determining the value the assessor shall also consider the advantages and disadvantages of location, quality of soil, quantity and value of standing timber, water power and privileges, mines, minerals, quarries or other valuable deposits known to be available therein and their value."

By Act No. 114, Pub. Acts 1911, approved April 25, 1911, and ordered to take immediate effect, it was made the duty of the State tax commissioners (hereinafter called the board) "to investigate, examine into, inventory and appraise all mining properties in the State of Michigan and all mineral rights which are subject to taxation," and for this purpose an appropriation was made, and the board employed, with the consent of the governor and the State board of audi-

tors, "such expert and clerical assistants as may be necessary to carry out the provisions of this act." A right given to the board to inspect the books and papers of any person, firm, or corporation owning, operating, or interested in any of such mining properties or mineral rights, and to examine under oath any officer, agent, or employee of any such person, firm, or corporation, and to require reports in writing under oath with respect to the matters and things provided for in the act, was exercised. The board employed Mr. James R. Finlay, an engineer, who had the assistance of Mr. C. K. Leith, professor of geology, Wisconsin university, and others, to make an expert examination and report, as contemplated by the act. August 18, 1911, Mr. Finlay submitted his report, together with various documents which form a part of it, and on August 21, 1911, the board reported the same to the State board of equalization. In the month of October, 1911, various meetings of the board were held for the purpose of reviewing the assessments of mining properties in the upper peninsula of Michigan, such a meeting being held October 6, 1911, at the city of Ironwood, in Gogebic county. Notice of these meetings was given, the assessment rolls of the various districts were presented and identified and examined, and interested parties invited to appear. The board in its report to the State board of equalization had, by the data which was furnished, shown the total actual real estate value of Gogebic county to be $56,467,012. The total assessed valuation of real and personal property (as assessed by the local boards of review) was $12,829,605. Among the properties assessed for taxation in Gogebic county, and lying partly within and partly without the boundaries of the city of Ironwood is the northwest quarter of section 24, town 47 north, range 47 west, in and upon which property is the Newport mine. The Newport mining property was

assessed in the city of Ironwood, on a total valuation for real and personal property, $1,988,640, and in the township of Erwin, $200,000, a total assessment of $2,188,640. The property was appraised by Mr. Finlay at $13,400,000, and at that sum entered into the total valuation of Gogebic county reported to the State board of equalization by the board, as hereinbefore stated. The value of this property was fixed by the board on the said review of the assessment rolls at $8,535,000. The tax based on this assessment was $98,996, which was paid by the Newport Mining Company, the plaintiff in this suit, under protest in writing, filed with the city treasurer. Thereafter, within the time fixed by law, demand was made upon the city for repayment of the tax, which was refused, and this action was begun.

The declaration contains the common counts in assumpsit, with a special count. Upon demand, the plaintiff furnished a bill of particulars, incorporating therein a copy of the protest filed with the city treasurer. The defendant, the city of Ironwood, pleaded the general issue. At the trial a jury was impaneled. The testimony having been concluded, each party moved for a directed verdict. The motion for the plaintiff was overruled, and that of the defendant granted. In this court the contentions of appellant are stated to be:

"(1) That Mr. Finlay's theory of appraisal and method of valuation, which, as shown by the testimony, was adopted by the board of State tax commissioners, made the mining business for which the property assessed was used the measure of the valuation upon which the assessment was based, whereas the only proper basis of the assessment was the value of the land.

"(2) That assuming that the probable profits of the business of mining and marketing the ore in the ground could properly be taken into consideration in determining the value of the land, such profits could

not lawfully be made the basis of the valuation and of the assessment.

"(3) That the board of State tax commissioners officially understood, at the time they proceeded to review the mining property, including that of the appellant, and to assess the same at what they claimed to consider its true value, that the nonmining property of the city of Ironwood and of Gogebic county and throughout the State was not assessed at anything like its true value.

"(4) That the assessment complained of is void because it is excessive and was made on an illegal and improper basis of valuation, without regard to the legal right of the appellant to have its property assessed relatively just with other property in the city, county, and State, and because the acts of the board of State tax commissioners in the premises were fraudulent and void."

In the form of propositions to which argument is addressed, they are stated as follows:

"I. The Finlay method necessarily led to a valuation of the mining business rather than to a valuation of the land.

"II. The modifications which the board of State tax commissioners made in Mr. Finlay's valuations were the results simply of a modification of certain of the factors used by Mr. Finlay in his calculations, and did not in any wise change the theory and method of valuation or the basis on which the valuations were made by Mr. Finlay.

"III. The method of valuation employed by Mr. Finlay and adopted by the board of State tax commissioners led to a speculative and fanciful valuation, which was greatly in excess of the fair selling value of the appellant's mine.

"IV. The board of State tax commissioners knew, or had good reason to know, at the time when they proceeded to review the assessment of the mining property and to assess the appellant's property at more than its true value, that the nonmining property of the city, county, and State was not assessed at anything like its true value.

"V. The acts of the board of State tax commission-

ers in the premises were fraudulent in law, and the tax complained of is unauthorized and void."

At the trial there was introduced in evidence the deposition of Robert H. Shields, who was the member of the board who attended the hearings in September, 1911, in the course of taking which deposition there was introduced in evidence, without objection, a document, indorsed "Appraisal of Mining Properties of Michigan by the State Board of Tax Commissioners," described by the witness as a true copy of the complete report of the board to the State board of equalization, and as including the report and appraisal of Mr. J. R. Finlay. The witness testified that the review of the assessments of mining properties undertaken by the board was upon its own initiative, on account of the conditions brought to the attention and notice of the board by the report of Mr. Finlay. There was also identified by the witness and introduced in evidence a typewritten copy of the transcript of proceedings had before the board at Crystal Falls on October 4, 1911, at Iron Mountain October 5, 1911, at Bessemer October 6, 1911, which transcript was admitted in evidence without objection. The witness further testified that the board did not undertake to make a review of assessments of property other than mining property during the year 1911 after their report to the State board of equalization; that as a result of the review there was added to the valuation of assessable property in Gogebic county as fixed by the local assessors $23,399,942, and that no change was made by the board in the assessment of property other than mining property in that county for that year; that:

"In making out the final assessment of the mining property of Gogebic county, so far as the method of appraisal was concerned, we practically adopted Mr. Finlay's method.

185 Mich.—43.

"*Q.* And it is correct, is is not, and you so understood, that that method was substantially as follows: That he estimated the future life of a mine according to the calculation and rules indicated in his report, and he estimated the average cost of production or operation according to the rules and theories indicated in his report, and the average price of ore according to the rules and theories indicated in his report, and upon those factors estimated the probable total profits from the operation of the mine for its entire life?

"*A.* Yes, sir; we used the same method. We didn't use the same figures.

"*Q.* But that was substantially the method which he followed and which you adopted. That is correct?

"*A.* Yes, sir; except that we—well, we used his method.

"*Q.* Then having arrived at the total gross profits of the operations in that way, it is correct, isn't it, and you so understood it, that he undertook to compute the present value of the mine based on the estimated total gross profits of its operations during its entire life?

"*A.* Yes, sir.

"*Q.* Upon the principles and according to the theory outlined in his report?

"*A.* Yes, sir.

"*Q.* And that is substantially what you did so far as the method is concerned?

"*A.* We used his method. We made a very material reduction, though, to cover any possible errors that he might have made and with reference to the future price and the percentage that he used in capitalization. The reduction that we made was from forty-one million five hundred and sixty thousand, to twenty-eight million and some odd thousand dollars; in round numbers about 30 per cent. from his total to our total of the whole districts. That 30 per cent. reduction doesn't mean 30 per cent. of his valuation of each and every different mine. Our total happens to be about 30 per cent. less than his total of the four districts. I think you will find some of the mines we assessed were left fully as high as the valuations he placed on them. We didn't apply a horizontal percentage of reduction to all of the mines he assessed.

"*Q.* How did you arrive at it?

"*A.* In a few words, the principal difference was in his estimation of the future life of a mine, and our estimation. That is, he would allow, or assume, greater tonnage below the lowest opening in the mine than we did, and that made up most of the 30 per cent. difference between his total valuation and the board's. He assumed a greater tonnage, greater future life of the properties, than our board did. That accounted for most of the 30 per cent.

"*Q.* And with the exception of that, you followed his rules and his principles of calculating the value, substantially?

"*A.* Substantially, except we made a further reduction to allow for any possible errors in his computations as to the future cost of the production per ton and the percentage that he used and any errors that might show in his figures as to the price of the ore. We allowed a considerable percentage of what we considered to be a margin of safety."

Mr. Shields further testified:

"*Q.* You testified, Mr. Shields, that Mr. Finlay used, and that you substantially adopted, the individual experience of the Newport Mining Company for the previous five years in arriving at the average cost of production. Now I suppose that you practiced the same plan, and used the individual experience of each of the other mining companies whose mine you assessed, in arriving at the average cost of their production; you used the same method as to the other companies?.

"*A.* That is my remembrance.  *  *  *

"*Q.* You say that substantially all of the evidence and knowledge upon which you acted in fixing the valuation of these mines was gained at the hearings?

"*A.* Well, I gained considerable during the time this data was being collected by Mr. Finlay. I talked with other persons at times, before and after the hearings, in a general way. I talked with mining men at different times about it, outside of these hearings; and I talked with Dr. Leith outside of the hearings very often, and got his idea of the arguments put forth by the different mining men. We did not, as soon as the hearing was over in each particular case, immediately determine the value of the mine. We

took some little time to consider it. We discussed the whole situation of each particular mine with Dr. Leith, and took time to consider the various arguments and facts that we heard, in fixing the valuations. In fixing the valuations of the Newport mine I certainly used my very best and honest judgment. I won't say that I got the correct valuation there, but it was my very best judgment, and, as I thought at the time, a conservative valuation. In arriving at my final judgment on the value I first took into consideration Mr. Finlay's report, and the different factors he took in determining his valuations, and also the arguments that the mining officials gave me at the hearings.

"*Q.* And took that into consideration, as well as Mr. Finlay's opinion?

"*A.* Yes, sir; the result shows it. * * * In assessing other mines, outside of the Newport, not' only in Gogebic county, but in the upper peninsula, I used my best judgment in each case to arrive at a fair value, and if I erred in any way I tried to err on the side of having it less than what I thought it was really worth, than more. When I started in I was very much impressed with the figures of Mr. Finlay, and I worked along with him during the summer, was to his office every day or so, and saw his methods and talked with him continually about his work, and was very much impressed with his results, and started in almost with the determination of adopting his figures on the rolls, unless evidence could be shown to the contrary, and at these hearings it developed to my satisfaction that Mr. Finlay's figures were pretty high, and I felt for assessment purposes I ought to be very sure that the properties were worth what they were assessed at. In adopting his figures for the State board of equalization we felt compelled to do that, in the absence of any contrary evidence, and as it was to be used just for equalization purposes, those were figures on the general property, showing that the general property was not assessed high enough. But I saw at these hearings, we listened to the representatives of different mines, and it developed there that his figures were somewhat high, and we cut out most of his extreme estimates below—at least a level below —I don't know that in our final determination we esti-

mated below 100 feet, while Mr. Finlay in some cases went considerably below. that.

"*Q.* You spoke of some data or memorandum you had, and I think you also said Dr. Leith kept a memorandum, of the way you arrived at these.

"*A.* I think we did; but it wasn't the policy of the board in arriving at the valuations of property to give out the estimates that we would make, or the figures we would use, when we would sit around the round table to determine the final valuation. Take in the case of railroads, we used our best judgment, and those figures were never given out. It represented our final judgment, and sometimes a compromise was made. In this case we didn't have to compromise with anybody. I acted as the board, but I satisfied my mind that if I was erring I was erring on the right side; but since that time developments may show we were wrong. At that hearing at Bessemer, and I think at every hearing, the Newport Mining Company, as well as the other mining companies, filed with me a written protest that property outside of the mines was not assessed at its full cash value. The Newport Mining Company never before that, to my knowledge, made complaint to me, or to the board of State tax commissioners, that property outside of the mines was not assessed at its full cash value."

The examination of this witness was pursued, is interesting, but cannot be restated. The foregoing perhaps sufficiently outlines its substance. His testimony and the testimony of other witnesses in this connection is regarded as of major importance by appellant, and that its contentions may be understood requires a considerable reference to the so-called Finlay method.

It has already been stated that, pursuant to the statute, the owners of mines were asked for statements, the nature of the information desired being indicated, and it may further be stated, in the language of Mr. Finlay, that:

"Practically all of the concerns in Michigan which admitted themselves to be mining companies, showed

a willingness to take great pains to furnish information fully and exactly, and to facilitate examination of maps and underground workings."

Mr. Finlay states his theory of appraisal as follows:

"A calculation of the value of mines to the permanent owner for the production of minerals. It is based on three factors: *First*, average cost; *second*, average prices, and *third*, an estimate of future life. The first two factors are determined by experience. The third factor, the life of the mine, is based partly on developed ore and partly upon an assumption of continuance of known ore bodies beyond the present bottom levels of the mines. The assumption of continuance is based mainly upon the extent to which the continuity of the deposits has been proven for the district and for the type to which the mine belongs. It will be seen that these factors are quite as definite as those upon which calculations in the world of business are generally founded.

"The future value of a series of dividends is reduced to a present value by the annuity method; that is, a sum is calculated upon which the series of dividends will pay 5 per cent. interest and also provide each year a sinking fund installment which, invested each year at 4 per cent. interest, and added to prior installments similarly invested and reinvested, will equal the sum taken. This sum is the amount which an investor can afford to pay for the property. * * *

"The reasoning from these factors is pursued to its consequences. No definite value can be placed on any property for which any of the factors cannot be determined. Whenever the working of a mine proves that expenditures will equal or exceed receipts from products at average prices, the property has no value at all, and it is appraised at zero. * * *

"The value of a mine depends wholly upon the ore; that is, the equipment of a mine has no value except as applied to the ore. It is therefore useless to appraise mining plants as if they were in themselves an asset. It is true that a mine cannot be worked without equipment. A mine fully equipped is more valuable than a mere ore body without equipment, but this fact is fully taken into consideration in all ap-

praisals. The point to be especially borne in mind is that mining equipment in itself is of no value; when the ore plays out the equipment is mere junk, no matter how costly it may have been in the first place; and this junk is so likely to be unsalable that it is fully as likely to entail expense for watchmen and insurance as it is to yield any salvage. This fact may be surprising to many people, but a little consideration will show that it is true. The equipment of a mine consists, very largely, of structures that cannot, by any possibility, be moved. The shafts and all other excavations are a part of the equipment. The buildings and machinery may occasionally yield some salvage, but necessarily a small amount. It must be borne in mind that a large part of the expense of any installation of machinery consists of labor and materials for foundations, housing, and erection. This is wholly lost when it is proposed to move the machine. Furthermore, the value of a machine depreciates rapidly on account of mere age.

"The valuations in this report are intended to cover the value of the mining business of a company in each case. It includes all value that can be put on mineral lands and mining, milling, and smelting equipment and mining supplies. It does not include property that can be valued for purposes other than mining, such as surface rights of any kind, agricultural or timbered lands, houses, stores, merchandise, or cash."

According to the Finlay method, the estimated net profit per ton of ore was arrived at by assuming that the cost of producing and marketing the ore would continue for next 20 years at what it actually averaged for the previous 5 years, and that the market price would continue for 20 years at the average price obtained the last 7 years. Applying his method to the Newport mine, Mr. Finlay says of it:

"This is the deepest mine, not only on the Gogebic range, but in the whole Lake Superior iron region. It is now working principally upon a great body of ore which has descended into it from the westward through the Norrie property. Above the 2,140 foot level there is reported in sight 5,475,000 tons. To this

can be added, with absolute confidence, 3,600,000 tons, merely by assuming that the developments on the 2,140 level will show the ore to be as large on that level as it is on the 1,940 level. This development has already progressed enough to demonstrate it as a practical certainty. This makes our estimate 9,000,000 tons assured. The question remains, How much ore should be allowed below the 2,140 foot level? An assumed extension of 270 feet additional depth would give us 8,000,000 tons. Another assumption, based on the possible termination of the ore body against a certain dyke about 1,000 feet to the eastward of the center point of the present ore body, gives approximately the same estimate, viz., 8,000,000 tons. If we use this we might assume a total of some 17,000,000 tons for this property. This is entirely reasonable because it is based only on one ore body. The Norrie mine shows two other large ore bodies below the one on which the Newport is working, and both pitching eastward into the Newport property. Absolutely nothing is known about the depth to which this mineralization may extend. I am satisfied that an expected life of 20 years at 800,000 tons a year will not meet with serious dissent on the part of the owners."

At the hearing before the board, upon the review of the assessment rolls, the manager of the Newport Mining Company appeared, and, after stating that the Finlay report had not been available for thorough examination, proceeded to say:

"From what information we have obtained, I take it that ore values, using the Newport assessment as a basis, were arrived at as follows:

"We are credited with a total tonnage of 16,000,000 to be mined during a period of 20 years at the rate of 800,000 tons per year. Of this tonnage it is estimated that a profit will accrue to the Newport Mining Company at the rate of $1.40 per ton, making a total yearly profit of $1,120,000. Taking from the Finlay report the present worth of a single dividend of $1 over a period of 20 years, which in this case is $11.96, makes our value $13,395,200, which, in order to make the amount in round numbers, has been increased to $13,400,000.  *  *  *  At the Newport mine, our

estimate of ore in sight as of April 10th is 5,475,000 tons. This we maintain is all the ore that can be rightfully charged to the Newport mine for taxation purposes. To our figure Mr. Finlay has added 3,600,000 tons above the 2,140-foot level, on the assumption that the ore area on this level will be the same as that on the 1,740-foot level. In addition to this amount, he has added an additional 7,000,000 tons for possible ore below our 2,140-foot level. We are willing to admit that if the assumptions of Mr. Finlay are correct, and we will be pleased if such is the case, his estimate is within reason. We do not, however, admit that Mr. Finlay, or any other person, has the right to assume for taxation purposes any ore over and above that which is actually developed. In submitting our estimate at the Newport, the same as as at the Anvil, we feel that we have made all the assumptions that are either necessary or required in submitting the figures we have."

In the course of his statement, he was asked by a tax commissioner the question, "How do you distinguish for assessing purposes?" and answered:

"The actual value of the mine. There is no question but that we are entitled, in determining our general policy, to take a chance on ores beyond our actual estimate, but I question whether the State has the right to definitely say that there is more ore on the property than can be actually seen. Take, for instance, his 16,000,000 tons. Suppose, for example, that the assessed valuations were placed on the properties in the exact figures as submitted by Mr. Finlay. If in the course of a few years you should determine that the geological conditions I have mentioned as a possibility were actual facts, we would have been paying taxes during that time a great deal in excess of what we should have paid, because the value was never in the mine.

"*Mr. Leith:* There is, of course, as you say, a very great difficulty in predicting far in advance. Conditions change very rapidly. Nobody can tell just what a dike will do. We have to go on certain expectations within reasonable limits. It is my belief, and I think very likely it is your belief, that ultimately that prop-

erty will show more tonnage than Finlay estimates. That is one thing, and to estimate the tonnage on which you can base the expectancy of life is another. The question is whether, in view of these circumstances, you would make a request for a cut of 60 per cent. in Finlay's estimate, which would be a larger reduction than any company has requested?

"*Mr. Brewer:* I do not care to change my statement, as I have already made it, in any way, that I consider the ore value of the Newport mine at 5,475,000 tons. However, I think I am safe in saying that our company is willing to go in on any basis equitable with other companies. If there is a certain expectancy given to the other companies, and we go in on the same basis, I do not think there will be any complaint on the part of the Newport Mining Company. I still claim, however, that the developed ore, and not the probable ore, is all that should be considered."

Another representative of large mining interests, protesting against the Finlay valuation, among other things, said:

"We contend that in fixing the actual cash value of this property nobody would be willing to assume the possibility or accept the possibility that Mr. Finlay has assumed in placing the value of the property. He has assumed a much larger quantity of ore beyond the actually developed ore bodies than any purchaser would accept if he had to invest his own money, or that of any corporation he was connected with. According to our figures we had developed 9,361,500 tons. These figures were made as accurately as we could make them from our actual measurements. Finlay adds to that 8,600,000 tons, making a total of 18,000,000 expected tonnage. We think there is no warrant for that, and it is not the actual cash value of the property, but greatly in excess of it.  *  *  *

"We do not believe that these ore bodies are going to cut out immediately below our present levels. We recognize the fact that in arriving at the actual cash value we have to take into consideration probable ore, but our contention is that Mr. Finlay, in estimating that additional ore, has gone beyond the limits of rea-

son. We think that the maps show we have reason for making that statement, and we are thoroughly satisfied that nobody would buy the property on an estimate of that kind."

He had before this time, at the same hearing, said:

"I do not take issue with Mr. Finlay as to the method. I think he has gone at it in precisely the same manner that I would use if I were buying the property myself or doing the work for my employers, but he has not taken into consideration a number of factors that are very, very important in the purchase of a mining property. For instance, in the first place, he has based his average value of the ore on the average price obtained during the past five years. I claim that he has no right to assume that that price is going to be as high during the life of the property, which, in the case of the Chapin, he figures at 15 years, and on some other properties he has extended this time to a period of 20 years."

Proceeding, he mentions other assumptions of Mr. Finlay, and other factors, as the increasing cost of timber and other operating costs, including labor and the market for ore. Another representative of large mining interests, who appeared at the hearing before the board, said:

"I appear for the Cleveland Cliffs Iron Company. It appears to me that it was physically impossible, in the time given by the legislature for the appraisal of these mines, for the appraiser to make a thorough examination and accurate estimate of the value of each mine. The method used by Mr. Finlay in arriving at the value of the mines is one which is used by engineers generally. This method involves the use of a number of factors, any one of which, being inaccurate, will disarrange the final result. I desire this morning to call attention to some errors in Mr. Finlay's calculation, and also to pick up some factors that have entered in Mr. Finlay's calculation and show wherein they should be modified."

Mr. Finlay's report gives the exact amount of the royalties paid on the various mines. The highest

royalty paid in any case, with the exception of one small mine, was 57½ cents a ton, the range of royalties being from 5 cents to 57½ cents a ton. In the case of the Newport mine, where the royalty is arranged upon a sliding scale, depending upon the price of ore, the average is 29 cents and a fraction.

An expert accountant, produced at the trial, testified that, assuming that the board in fixing its valuation of the Newport mine assumed the tonnage to be 11,000,000 and the annual production 800,000, the value of the ore, calculated on the royalty basis, assuming in the amortization of the royalties 7 per cent. interest, the present value of the Newport mine, at the different rates of royalty, would be as follows:

"At 35 cents it is $2,448,740; at 40 cents $2,798,560; 45 cents $3,148,380; 50 cents $3,498,200; 55 cents $3,848,020; 60 cents $4,197,840; 65 cents $4,547,660; 82 cents $5,737,048."

Amortizing at the rate of 5 per cent. interest, the present value would be:

"At 35 cents $3,454,524; 40 cents $3,959,456; 45 cents $4,454,388; 50 cents $4,949,320; 55 cents $5,444,252; 60 cents $5,939,184; 65 cents $6,434,116; 82 cents $8,116,885."

The Finlay report was based in part upon statements furnished by the company showing the conditions existing in April, 1911. From that date to the time of trial, May, 1913, the Newport had mined 1,500,000 tons of ore. Its report to the State tax commission shows that on December 31, 1912, the total tonnage above the nineteenth level was 6,060,000 tons. The record shows that at the time of the trial the breast of ore in the east end of the nineteenth level was about 500 feet, at least 75 per cent. was in ore, and that the ore body gave no evidence of weakening. In 1911, the Newport mine

mined and shipped 555,853 tons of ore; in 1912, 966,435 tons; and, in the spring of 1913 had sold, to be mined and shipped during the year, 1,140,446 tons, a total for the three years of 2,662,734 tons, an average of more than 887,000 tons for each year, and of over 1,000,000 tons annually for the last two years.

Ostrander, J. (*after stating the facts*). 1. It was held in *Chicago, etc., R. Co.* v. *Babcock*, 204 U. S. 585, 27 Sup. Ct. 326, cited by plaintiff, that in an independent proceeding attacking the judgment of an assessing board it is improper to cross-examine the members in an attempt to exhibit confusion in their minds as to the method by which the result was reached. It was further held that, in a suit to declare void assessments, the court would not consider complaints as to the results reached by a State board of assessors, except those based on fraud or the adoption of a fundamentally wrong principle. It was said:

"The board was created for the purpose of using its judgment and its knowledge." "Within its jurisdiction, except, as we have said, in the case of fraud or a clearly shown adoption of wrong principles, it is the ultimate guardian of certain rights. The State has confided those rights to its protection, and has trusted to its honor and capacity as it confides the protection of other social relations to the courts of law. Somewhere there must be an end."

The conclusions and the language here referred to may be adopted by this court in this case. Appellant says:

"We do not claim that Mr. Shields was limited to any particular process of reasoning in arriving at the valuation of the land, or that there was any legal objection to making any reasonable calculation of the probable profits of the business of mining the ore to aid his judgment, in arriving at the value of the mine. What we object to is the adoption of any calculation

intended to embrace the present worth of all the profits as the measure of the value of the land."

As witnesses for plaintiff and for defendant, who spoke upon the subject, maintain, some such method as that of Mr. Finlay must be used to determine the value of the mineral, and therefore of the land. And if it is true that the Finlay method necessarily led to a valuation of the mining business, it does not follow, I think, that its result was not the fair value of the land. Large iron mines are, it seems, very infrequently sold. Comparisons, therefore, cannot be made to determine the cash value by any standard of selling value. The statute direction, already referred to, is that the quantity and value of minerals, when known to be available therein, must be considered by the assessor in determining the value of land for taxation. It will be admitted that the availability and value of minerals, unmined, are not matters of common knowledge, nor to be correctly ascertained or estimated except by men possessed both of certain particular information and of expert knowledge. A number of factors have to be considered in determining whether, it being made apparent that there is a deposit of ore in a given locality, it is available, there being no mine or mining carried on. Its availability —that it has commercial value and the ease and cost of coming at it in mining—would have to be considered, as well as its quality and quantity. The extent and quality of the ore body being known, or estimated, one important factor in determining taxable value—cash value—would be secured. This factor being considered, some person or corporation might be willing to undertake the mining of the ore, paying the landowner therefor. Usually, the price to be paid would be a fixed price per ton during the continuance of mining operations, or a variable price, depending upon the quantity, or selling price, of ore mined and

shipped, or both. The expense of opening the mine, of conducting mining operations, would be incurred, and if the adventure was successful the owner of the fee would receive, in installments, his royalties, his selling price of the ore. For purposes of taxation, the State would not be bound to accept the amount of royalty bargained for by the landowner as controlling its valuation of the land. It might occur—has frequently occurred—that, the ore body being developed, the owner of the mining lease would be able to sell it upon a royalty basis in excess of the royalty reserved in the lease. And, besides, the miner pays the royalty and still, if successful, makes a profit on the ore. In the case of the Newport mine, at the time the assessment complained about was made, much that in a new adventure would be considered as problematical, as uncertain, had been made certain. The mine was in operation. The quality of ore was assured, the quantity to a certain point was actually determinable, measurable. Experience had proved that, as the mine was equipped and managed, a definite quantity of ore could be, had been, moved and marketed, annually, the cost of mining and the market price of the ore. The equipment, costly or otherwise, was performing its part in the operation. At a given rate of mining the ore body would be exhausted in a determinable period, during which period the value of the ore would be recovered in installments. No question remained concerning the quantity of the ore in sight, its availability, or its immediate value when mined. What remained to be determined was the quantity of ore not in sight, and the present value of the land.

What would an intending purchaser have done, under such circumstances? What would the landowner have required? Clearly, first, an estimate of the quantity of ore not in sight. Such an estimate

having been made, the price to be paid would depend upon the views of the buyer and the seller as to the annual rate of mining and the market value of the ore mined. The rate of mining would enable them to judge, not with absolute precision, the rate of recovering the value of the ore. It is not important to know just what terms a buyer and seller of the mine would agree upon. The point we are concerned with is whether a method, wrong in principle, was adopted by the assessing officers in their endeavor to form a judgment as to the present value of the particular land. There is no reasonable ground for contending that the State may not use the methods of business to ascertain such values. In such a case, it is not compelled to ignore, or discount, the facts of demonstrated availability, quantity, and quality of mineral. If a rule or method exists by which engineers and business men ascertain the values of ore bodies for the purpose of buying and selling them, if no better rule is or can be suggested, how can it be said that the rule is wrong in principle when adopted by the State? The State must, of necessity, treat the peculiar subject of taxation as the subject requires, not to change or modify a cardinal rule of taxation, but to apply it. Upon this record no other rule is suggested, and the rule employed is conceded to be the rule of engineers in like cases.

That all of the mineral in the ore body is not in sight is conceded. What ought to be added is matter of judgment. The legislature provided as an aid to assessing officers expert judgment upon the subject. Experience has, to some extent, confirmed the estimate which was made. The future cost of mining and the future price of ore are uncertain, but not too uncertain to be made the basis for present valuation of the mine, as matter of business. The State may

act upon considerations which business men act upon, so long, at least, as those considerations appear to universally affect and determine, for business purposes, for buying and selling, the value of mining properties. At present, the method employed appears to be scientific, and the result justified by experience.

Opinions may differ concerning the rate of interest upon which amortization should be computed. It does not appear that the judgment of the board was exercised upon other than a sound foundation, with a sincere purpose to reach a proper conclusion.

There is another consideration affecting the question at issue. The board did not adopt the valuation of the experts. On the contrary, it assessed the property at a sum nearly $5,000,000 below that valuation. Was this an extravagant valuation, in view of all facts before the board? Suppose it did adopt Mr. Finlay's method, will it be contended that if the valuation placed upon the mine was no greater than its owners would concede to be its value, because the method was employed the tax must be held invalid? But, as has been pointed out, the result of the method, that is to say, the result of the combination of factors employed by Mr. Finlay, as he employed them, was not made the conclusive measure of the value of the land. The board did not adopt, as the measure of the value of the mine for purposes of taxation, an estimate of the future profits of the business of mining and selling ore.

2. There is yet to be considered the contention that the plaintiff's property was valued, relatively, at too large a sum. In the argument, valuation of mines is contrasted with valuation of other classes of real property and with valuations of personal property. It is contended, anticipating the argument of necessity, that at any rate the valuation of real property

185 Mich.—44.

in the assessment district should have been relatively equal, and that it is shown that it was not so.

It appears that the State board of tax commissioners had some information, and that the individual members shared with many others a belief, that the property of the State was not uniformly assessed at its cash value. Before the year 1911 the board had power, when a complaint was made to it, to review rolls in the district from which the complaint came. It had not until the year 1911 power to undertake such a review of rolls upon its own motion. The history of legislation upon the subject confirms the fact that the belief was very general that local assessing officers did not, as a rule, value property for assessment at its cash value, and that the feeling was general that the condition ought to be remedied. The information, which in 1911 the board derived in part from Mr. Finlay, was that in Gogebic county the total assessed value of real estate in the county was $12,829,605, of which $7,491,457 was the value of mining and $5,338,148 was the value of nonmining real estate, that the value of mining property alone was, in fact, $41,560,000 and of nonmining $14,907,012. In the city of Ironwood in 1911, real estate was assessed by the board of review—mining at $3,427,413, nonmining, $918,560, a total of $4,345,973. The information derived from Mr. Finlay was that the mining property in the city was worth $35,170,000. The board submitted the information it had to the State board of equalization, not as decisive of what it would assess the property of the county for, but as information which had come to it. In 1912, the nonmining real estate of Ironwood was assessed at $2,778,453, the total nonmining property of the county at $18,504,105, the total real estate of the county being assessed at the sum of $45,715,405.

The argument that property, generally, in the State was underassessed in 1911, and that the property of plaintiff was therefore relatively and fraudulently overassessed, is answered, I think, by the statement that, admitting there was a general condition which needed to be remedied, the remedy had to be applied in detail and not generally, unless the last condition was to be made worse than the first. There is more force to the argument that, having entered a district for the purpose of applying the remedy, it should have been applied to all property, and not to mining property alone. The argument considerably disturbed the trial court, as appears from his charge. The reason assigned by the board for not generally reviewing the assessment rolls was lack of time. No one can tell what it might have done had a review been attempted.

I am impressed that sufficient appears to show that the burden placed upon mining property, including that of plaintiff, when compared with nonmining property, was excessive, that no sufficient data appears for determining what would be a relatively equal burden, and that the whole tax ought to be held fraudulent and void. A majority of the justices are, however, not convinced that this fact is made to appear in the particular case. In support of an opposed conclusion it is said that it cannot be assumed for the purposes of this case that the nonmining property in the county in 1912 was substantially the same in value as the nonmining property there in 1911, and that in any event we are not required in this case to consider the valuation of the entire county. The record discloses no specific data for the conclusion that nonmining property in the city of Ironwood was not assessed in 1911 as high, relatively, as was the mining property. It has been pointed out that Mr. Finlay gave it as his opinion that the mining property

in the city was worth $35,170,000. The board valued it at $23,283,000. Assuming that the valuation fixed by the board was the fair cash value, how can it be determined that other property in the city was not relatively assessed at its cash value? The board reported to the State board of equalization that real estate, as a whole, was assessed in the county at 22.7 per cent. of its actual value. But it does not follow that in Ironwood, in which the plaintiff's mine and others were situated, real estate, other than mining, was assessed at only 22.7 per cent. of its value. Mining property in the city was assessed at only 10 per cent. of its value, as finally determined by the board. There can be no doubt about the rule relied upon by plaintiff. It has been repeatedly announced and applied by this court. While exact equality in taxation can never be achieved, intentional inequality of assessment invalidates the tax. *Merrill* v. *Auditor General*, 24 Mich. 170; *Auditor General* v. *Hughitt*, 132 Mich. 311 (93 N. W. 621); *Solomon* v. *Township of Oscoda*, 77 Mich. 365 (43 N. W. 990); *Auditor General* v. *Pioneer Iron Co.*, 123 Mich. 521 (82 N. W. 260). It is as well settled that fraud in the assessment must be made out.

The things supposed by plaintiff to be tangible evidence of the fact that the valuation of one class of property in the city was raised, and that the valuation of another, or of other classes, known to be undervalued, was not raised, are:

*First,* the general impression concerning the general undervaluation of all property; *second,* the increase in assessed valuation of other property in the city in 1912; *third,* the report of the board to the State board of equalization, which is treated as an admission of its information upon the subject.

The reply is that no one can point to anything in

the record which clearly justifies a finding that mining property was assessed relatively higher than other property in the city in 1911.

The judgment is affirmed.

BROOKE, C. J., and MCALVAY, KUHN, STONE, BIRD, and STEERE, JJ., concurred. MOORE, J., did not sit.