TWENTY-TWO CHARLOTTE, INC., v. CITY OF DETROIT.

1. Taxation—Hotels—Appraisal on Cubic Footage.
Discriminatorily high rate for tax appraisal of hotel property cannot be said to have been applied to plaintiff's property where it was 2 mills per cubic foot for reconstruction cost higher than 2 other comparable hotels, the same rate as another, and from 9 mills to 5 cents lower than 3 others in the same general area.

2. Same—State Tax Commission as Final Arbiter.
The final arbiter of the value of property for taxing purposes which, when it has jurisdiction, determines the same finally and conclusively is the State tax commission.

3. Same—Court Interference.
Courts are slow to interpose their judgment to say that an assessment for tax purposes has transgressed reasonable limits.

4. Same—Fraud—Overassessment—Equity.
In the case of fraud or clearly-shown adoption of wrong prin-

ciples resulting in an intentional overassessment for tax purposes, a court of equity has jurisdiction to relieve the burden of the oppression.

5. SAME—APPRAISAL—USUAL SELLING PRICE—EVIDENCE.

In the appraisal of property for tax assessment purposes the bargain of the taxpayer is not controlling evidence of the usual selling price at private sale since where property is singular in character and sales are separated by many years, a single sale does not conclusively establish the "usual selling price" as that term is used to describe the focus of buyers and sellers of commodities actively exchanged in an open market (Const. 1908, art. 10, §§ 3, 7; 1 Comp. Laws 1929, § 3415; Detroit charter, title 6, chap. 2, § 1).

6. SAME—HOTELS—USUAL SELLING PRICE.

In the valuation problem faced by officers assessing a hotel, which was located a half mile from the main retail business district of a large city, and which had been unoccupied for seven years during the depression, was purchased under a land contract for $75,000, repaired at an expense of $17,000 and acquired a potential annual gross earning capacity of upwards of $45,000, the test of the "usual selling price" is merely a guide for their determination; providing, under the circumstances, a standard for a hypothetical or fictitious market and requiring the assessors to consider the factors which motivate buyers and sellers to exchange their interests and to determine at what point the inertia to trade is overcome (Const. 1908, art. 10, §§ 3, 7; 1 Comp. Laws 1929, § 3415; Detroit charter, title 6, chap. 2, § 1).

7. SAME—HOTEL—ALLOWANCE FOR OBSOLESCENCE AND LOCATION.

In the assessment for 1938 of a 9-story, 185-room hotel property about a half mile from main retail business district of a large city, which had been unoccupied from 1931 to 1937, sold on land contract for $75,000, upon which $17,000 had been spent in repairs, after which it had a potential annual gross earning capacity of $45,000, where appraisal was made by using replacement cost less depreciation rate of 2½ per cent. per year on the diminishing value method, an additional allowance of 5 per cent. for obsolescence and because of the location *held*, adequate in view of the large potential earning capacity (Const. 1908, art. 10, §§ 3, 7; 1 Comp. Laws 1929, § 3415; Detroit charter, title 6, chap. 2, § 1).

8. SAME—HOTELS—ALLOWANCE FOR OBSOLESCENCE.

The allowance for obsolescence in assessment of property for taxes necessarily depends on the circumstances for each case.

9. SAME—HOTELS—POTENTIAL EARNING CAPACITY.

For tax assessment purposes, the potential earning capacity of a hotel is a helpful guide in determining the extent of economic, as distinguished from physical, impairment of the property.

10. SAME—VALUATION OF PROPERTY FOR ASSESSMENT PURPOSES.

A generally approved practical scheme of valuation of property for tax assessment purposes may yet produce fundamentally wrong results under the circumstances of a particular case.

11. SAME—ASSESSMENTS—HOTELS—REPRODUCTION COST LESS DEPRECIATION.

The assessment of a 9-story, 185-room hotel property, which was located a half mile from the main retail business district of a large city, was sold on land contract for $75,000 after having been unoccupied for 7 years, $17,000 spent in repairs, and which then had a potential annual earning capacity of upwards of $45,000, at $175,600 on a reproduction cost less depreciation method of valuation *held*, not to have amounted to an overvaluation for tax assessment purposes (Const. 1908, art. 10, §§ 3, 7; 1 Comp. Laws 1929, § 3415; Detroit charter, title 6, chap. 2, § 1).

12. SAME—OVERVALUATION—FRAUD.

Overvaluation is not of itself sufficient to warrant injunction against any part of the taxes based on a challenged assessment, mere error of judgment of the assessor not being enough since there must be something that in legal effect is the equivalent of intentional or fraudulent overvaluation.

13. SAME—COURTS—DISCRETION OF TAX ASSESSORS.

A court should not interfere with the determination of tax assessors as to valuations placed upon property so long as their action is compatible with an honest effort to adopt valuations not relatively unjust or unequal.

14. SAME—EQUITY—FRAUD—DISCRIMINATION.

A court of equity will not interfere with a tax assessor's determination unless there is fraud, intentional overassessment which amounts to fraud, or discrimination.

15. SAME—DISCRETION OF TAX ASSESSORS—COURTS.

The determination of the weight to be given each factor involved in the assessment of hotel property for tax purposes, such as a recent actual sale price, economic depreciation, obsolescence, or change of neighborhood, is not arbitrary, and as long as the valuation is placed within reasonable limits, a court may not interfere and say that the conclusion of the traders

is right and that of the assessing officers is wrong as it may not interfere with the action of tax assessors who have properly exercised their discretion.

Appeal from Wayne; Webster (Clyde I.), J. Submitted April 18, 1940. (Docket No. 82, Calendar No. 41,035.) Decided September 6, 1940.

Bill by Twenty-two Charlotte, Inc., a Michigan corporation, to enjoin the City of Detroit and its board of assessors from collecting a portion of the 1938 city taxes on its property and to have such portion declared void. Bill dismissed. Plaintiff appeals. Affirmed.

*Fred W. Lindbloom* (*Alfred Lindbloom*, of counsel), for plaintiff.

*Paul E. Krause*, Corporation Counsel, and *John H. Witherspoon*, Chief Assistant Corporation Counsel, for defendants.

Butzel, J. Plaintiff filed a bill to enjoin the collection of the 1938 real-estate tax on its property in the city of Detroit, on the ground that the assessment valuation was based on a fundamentally wrong method which was deliberately arbitrary and in plain violation of the Federal and State Constitutions. Plaintiff offered to do equity by tendering its alleged proper tax (*Merrill* v. *Humphrey, Auditor General,* 24 Mich. 170; *Birmingham* v. *Oakland County Supervisors,* 276 Mich. 1). The trial judge adopted the findings of fact and law of the circuit court commissioner to whom the case was referred, and the bill was dismissed.

The property in question is known as the Reid Hotel, and is situated at 22 Charlotte street in the city of Detroit. At one time it was connected with

the Addison Hotel located at the northwest corner of Charlotte and Woodward avenues. In 1931, the Detroit Trust Company acquired title to the property through foreclosure of a mortgage securing an outstanding bond issue of $250,000 on both hotels. Plaintiff, through an intermediary, acquired the Reid Hotel in 1937 on a land contract for the sum of $75,000, paying $5,000 down and agreeing to pay the balance within two years without interest. Immediately repairs were made at a cost of about $17,000. Following these repairs in 1937, plaintiff has been operating the building as a hotel, thus ending the period of unoccupancy from 1931 to 1937.

In 1930, the land site was assessed at $70,420 and the building at $324,400, making a total of $394,820. During the following three years reductions were made so that, by 1934, valuation of the land was placed at $28,850, and that of the building at $100,-000; for the next three years, the building assessment remained the same, but the land assessment was reduced to $25,600. In 1938, after the repairs were made and the building was restored to tenantable condition, the building was assessed at $244,700, subsequently reduced after protest to $150,000, while the land continued to be valued at $25,600, making a total assessment of $175,600. Plaintiff refused to acquiesce in this valuation and paid under protest one-half of the 1938 assessed tax and tendered an additional amount which it claimed satisfied the full lawful tax liability based on the tax rate per thousand multiplied by what plaintiff insists is the "true cash value" of the building. The city treasurer declined the tender. The board of review and the State tax commission denied plaintiff's petition for further reduction of the valuation. Plaintiff then filed this suit asking to be relieved of the alleged illegal portion of the tax.

The building is located about a half mile north of

the main retail business district of Detroit. It adjoins the older, smaller, less valuable Addison Hotel. The Reid Hotel is nine stories high and consists of two wings with a court between them above the first floor. The rooms are larger in size and therefore fewer in number than would be constructed in a comparable building of today. There are 185 rooms, for which rent is asked at a weekly rate of $5 per room, including men's laundry and regular hotel service. The hotel averages about 20 transients per day at a charge about double the weekly rate. The potential annual gross earning capacity is upwards of $45,000.

While the surrounding neighborhood has deteriorated, one of the main features of the hotel location is its proximity to Woodward avenue, which makes the building very easily accessible. The defendants showed that in appraising the building, they multiplied the cubical content by the rate per cubic foot (comparable with the replacement cost of a new building), then applied a depreciation rate of $2\frac{1}{2}$ per cent. per year on the diminishing value method and finally allowed an additional reduction of 5 per cent. because of the location of the building. It was shown that six other comparable hotels in the downtown section of Detroit were assessed at approximately the same rate per cubic foot: the Reid Hotel and another at 10.2 cents; two older hotels at 10 cents; one at 11.1 cents; one at 14 cents; and another at 15.2 cents. It cannot be said that a discriminatorily high rate has been applied to the Reid Hotel.

The Constitution of 1908, art. 10, § 3, commands that the legislature shall provide a uniform rule of taxation, except on property paying specific taxes. Article 10, § 7, declares that:

"All assessments hereafter authorized shall be on property at its cash value."

Title 6, chap. 2, § 1, of the charter of the city of Detroit provides:

"All real and personal property within the city subject to taxation by the laws of this State, shall be assessed at its true cash value by the board of assessors herein provided."

Section 3415, 1 Comp. Laws 1929 (Stat. Ann. § 7.27), defines "cash value":

"The words 'cash value,' whenever used in this act, shall be held to mean the usual selling price at the place where the property to which the term is applied shall be at the time of assessment, being the price which could be obtained therefor at private sale, and not at forced or auction sale. In determining the value the assessor shall also consider the advantages and disadvantages of location, quality of soil, quantity and value of standing timber, water power and privileges, mines, minerals, quarries or other valuable deposits known to be available therein and their value."

Under the Constitution and laws of this State, the "final arbiter of value for taxing purposes which, when it has jurisdiction, determines the same finally and conclusively, is the State tax commission." *Hudson Motor Car Co.* v. *City of Detroit*, 282 Mich. 69, 81 (113 A. L. R. 1472). Courts are slow to interpose their judgment to say that the assessment has transgressed reasonable limits. *S. S. Kresge Co.* v. *City of Detroit*, 276 Mich. 565 (107 A. L. R. 1258); *Sloman-Polk Co.* v. *City of Detroit*, 261 Mich. 689 (87 A. L. R. 1294); *Rowley* v. *Railway Co.*, 293 U. S. 102 (55 Sup. Ct. 55). In *Newport Mining Co.* v. *City of Ironwood*, 185 Mich. 668, reference was made to the statement of Mr. Justice Holmes in *Chicago, B. & Q. R. Co.* v. *Babcock*, 204 U. S. 585 (27 Sup Ct. 326):

"The board was created for the purpose of using its judgment and its knowledge. (Citations omitted). Within its jurisdiction, except, as we have said, in the case of fraud or a clearly-shown adoption of wrong principles, it is the ultimate guardian of certain rights. The State has confided those rights to its protection, and has trusted to its honor and capacity as it confides the protection of other social relations to the courts of law. Somewhere there must be an end."

In *Merrill* v. *Humphrey, Auditor General, supra,* Justice COOLEY pointed out that:

"The courts cannot sit in judgment upon supposed errors of the assessor, and substitute their own opinions for the conclusions he has drawn, where it is his judgment, and not theirs, to which the subject has been confided by the law."

However, the principle is clear that intentional overassessment is fraud, and equity has jurisdiction to relieve the burden of such oppression. *Sloman-Polk Co.* v. *City of Detroit, supra.* The evidence must clearly show intentional violation of duty or disregard of the taxpayer's rights. *Copper Range Co.* v. *Adams Township,* 208 Mich. 209.

Plaintiff challenges the assessment by the argument that there is only one proper method of valuation, that is, by determination of the usual selling price, and since there is no claim that the actual price paid was not the usual selling price, the court should determine that the correct assessment in this case is $92,000. This figure is the sum of the purchase price of the building ($75,000) and the cost of repairs ($17,000). It is contended that the assessors gave too great weight to the reproduction cost less depreciation figure in arriving at the assessment, and for the type of building in question, its age, location, and actual sale price to plaintiff,

the method is clearly unreasonable, citing *City of Detroit* v. *Detroit & Canada Tunnel Co.* (C. C. A.), 92 Fed. (2d) 833, wherein it was held that "persistently adhering to cost less depreciation as a formula" and "ignoring the capitalized income method" constituted a denial of equal protection of the law. We do not think the assessment before us may be so criticized.

The bargain of the taxpayer is not controlling evidence of the "usual selling price * * * at private sale." Where property is singular in character and sales are separated by many years, there is no usual selling price in the sense the expression is used to describe the focus of buyers and sellers of commodities actively exchanged in an open market. Nor did the legislature intend that a single event be conclusive. In the valuation problem the assessing officers had to resolve in the instant case, the test of the "usual selling price" is merely a guide for determination; under the circumstances before us the definition provides a standard for a hypothetical or fictitious market. It was the duty of the assessors to consider the factors which motivate buyers and sellers to exchange their interests (*Olson* v. *United States,* 292 U. S. 246 [54 Sup. Ct. 704]), and to exercise their judgment in an honest effort to determine at what point the inertia to trade is overcome.

In *Cleveland-Cliffs Iron Co.* v. *Republic Township,* 196 Mich. 189, Justice Ostrander said:

"The legislative statement of the meaning of cash value, which is really a statement of tests to be applied in determining cash value, is not exclusive or inclusive. The tax law must be read as a whole. The general purpose of the law is to subject property to a proportionate payment of public levies. * * * It is usually persuasive of the value of a par-

ticular piece of property when its owner after nego-
tiations sells it at private sale at a particular
price. * * *

"On the other hand, such sales of mines are not
common; are rarely made. There is no market for
the fee of iron mines, and no usual selling price for
them. There can be none, and it is likely that a
dozen similar sales would afford no reliable data
for the valuation of any unsold iron mine. On the
other hand, too, by approved methods the State had
determined the value of this mine to be more than
$1,000,000, in which it was in agreement with the
superintendent of the mine, a man of experience.
In this it employed certain factors, and with all the
rest the judgment of the assessing officers. * * *
The result arrived at by the assessing officers, ap-
proved by experience, by the history of the mine, is
questioned by nothing except the price for which
the land was sold. The fact that the property had
been sold was a fact to be considered by the asses-
sing officers who were nevertheless, in view of all
the facts, required to determine, according to their
best judgment, the cash value of the property. * * *

"The case for plaintiff is, I think, no better than
this: The good faith, judgment, and conclusions of
the assessing officers is opposed by the good faith,
judgment, and conclusions of the vendor and vendee
of the land, affected, in the case of the vendor and
vendee, by private interest. But the duty, in this
behalf, rests upon the assessing officers, and their
discharge of it, in this case, cannot be interfered
with by the court."

Prior to the depression there was a fairly ready
market for real estate of the kind here in question,
and it was fairly possible to ascertain the price
likely to be obtained at a private sale, for ready
and willing buyers and sellers could be found. How-
ever, for the past several years, sales of comparable
properties have been rare, and for this reason we

cannot hold that one sale is a controlling index of the true cash value; where there is some trading the two tend to coincide. But in the case before us, the property had been vacant for several years before the sale and the rehabilitation efforts after the sale. The tax officers cannot be compelled to take as conclusive the actual sale price under such conditions and close their eyes to the effect on value of the restoration to usefulness. Nor do we think the use of reproduction cost less depreciation as a basis, with allowances for obsolescence and other relevant factors, is unfair or fundamentally wrong so long as the result is fair and discrimination is absent. The assessors have made allowance for obsolescence, location of the building, and the potential earning capacity from the uses to which it may be put. The allowance for obsolescence necessarily depends on the circumstances of each case. The potential earning capacity is a helpful guide in determining the extent of economic, as distinguished from physical, impairment. The allowance of five per cent. in the instant case seems to us fully adequate in view of the large potential earning capacity of the building.

*City of Detroit* v. *Detroit & Canada Tunnel Co., supra,* does not require us to condemn the tax because the reproduction cost less depreciation value was the starting point for the assessors. While the court there used broad language branding as fundamentally wrong this method, the language must be read as applied to the facts of that case. A generally approved practical scheme of valuation may yet produce fundamentally wrong results under the circumstances of a particular case. *Fargo* v. *Hart,* 193 U. S. 490 (24 Sup. Ct. 498); *Union Tank Line Co.* v. *Wright,* 249 U. S. 275 (39 Sup. Ct. 276); *Wallace* v. *Hines,* 253 U. S. 66 (40 Sup. Ct. 435); *Rowley*

v. *Railway Co., supra.* See, also, *Illinois Central R. Co.* v. *Minnesota,* 309 U. S. 157 (60 Sup. Ct. 419). The reproduction-cost-less-depreciation method of valuation produced a result which clearly transcended reality in the *Tunnel Case* and for this reason the tax was stricken down.

"If the result was clearly wrong, the method used would not save it." *Bailey* v. *Megan* (C. C. A.), 102 Fed. (2d) 651.

There is no such shocking unreality in the case before us.

Plaintiff argues that overvaluation without discrimination is a constitutional defect within the holding of *Great Northern Railway Co.* v. *Weeks,* 297 U. S. 135 (56 Sup. Ct. 426). In that case it was held that failure "to take into account and give due weight to the sudden, progressive and enormous declines of value" from 1929 to 1935 made the assessment arbitrary and "in plain violation of established principles that govern property valuation." The facts of the case before us plainly show that declines in value were reflected in the valuation since 1930. We hold that there was no overvaluation within the principles laid down in the *Weeks Case,* notwithstanding that the rule making mere overvaluation without discrimination a constitutional defect has been repudiated in a later decision of the supreme court of the United States: *Nashville, C. & St. L. Ry.* v. *Browning,* 310 U. S. 362 (60 Sup. Ct. 968). The opinion in the *Weeks Case* carefully pointed out that:

"Overvaluation is not of itself sufficient to warrant injunction against any part of the taxes based on the challenged assessment; mere error of judgment is not enough; there must be something that in legal effect is the equivalent of intention or fraudulent purpose to overvalue the property and so to

set at naught fundamental principles that safeguard the taxpayer's rights and property."

Within the holding of the *Weeks Case,* upon which plaintiff relies, without reference to the *Browning Case,* we may decline to interfere with the determination so long as the action of the authorities is compatible with an honest effort to adopt valuations not relatively unjust or unequal. A court of equity will not intervene unless there is fraud, intentional overassessment which amounts to fraud, or discrimination. *Sloman-Polk Co.* v. *City of Detroit, supra; Nashville, C. & St. L. Ry.* v. *Browning, supra.*

As a charge of arbitrariness, plaintiff says in its brief that:

"We are in the dark as to how the actual assessment of $150,000 on the building was arrived at. We do not know what weight was given the sales price or to the economic depreciation, obsolescence, change of neighborhood," et cetera.

This is not a test of arbitrariness; we are not to probe the mental processes of the assessors or of the administrative reviewers. The determination of the weight to be given each factor is not arbitrary, "except in the sense in which many honest and sensible judgments are so. They express an intuition of experience which outruns analysis and sums up many unnamed and tangled impressions; impressions which may lie beneath consciousness without losing their worth." (Holmes, J., in *Chicago, B. & Q. R. Co.* v. *Babcock, supra*). In *Great Northern Ry.* v. *Weeks, supra,* Mr. Justice Butler said:

"In determining the amount of the assessment the board was not bound by any formula, rule or method, but for guidance to right judgment it was

free to consider all pertinent facts, estimates and forecasts and to give to them such weight as reasonably they might be deemed to have. Courts decline to disturb assessments for taxation unless shown clearly to transgress reasonable limits.''

We think there is no violation of the rule of fundamental law which protects against intentional and arbitrary discrimination in the execution of the tax laws. *Sunday Lake Iron Co.* v. *Township of Wakefield,* 247 U. S. 350 (38 Sup. Ct. 495), affirming 186 Mich. 626; *Rowley* v. *Railway Co., supra; Illinois Central R. Co.* v. *Minnesota, supra.* The determination before us has not transgressed the bounds of honest judgment. When we find that the assessment is within such limits, our inquiry must end. We may not say that the conclusion of the traders is right and that of the assessing officers is wrong (*Cleveland-Cliffs Iron Co.* v. *Republic Township, supra*), for the law stamps finality on the exercise of judgment before the controversy comes to us. *Merrill* v. *Humphrey, Auditor General, supra; S. S. Kresge Co.* v. *City of Detroit, supra.*

The decree is affirmed. Costs to defendants.

BUSHNELL, C. J., and SHARPE, CHANDLER, NORTH, MCALLISTER and WIEST, JJ., concurred. The late Justice POTTER took no part in this decision.