35 So.2d 183

### HAMILTON v. ADKINS et al.
### 6 Div. 679.

Supreme Court of Alabama.
April 8, 1948.

Rehearing Denied May 13, 1948.

558

A. A. Carmichael, Atty. Gen., Gardner F. Goodwyn, Jr., Asst. Atty. Gen., Willard McCall, Deputy Solicitor of Jefferson County, and Thos. E. Huey, Jr., Asst. City Atty., both of Birmingham, for appellant.

Hugh A. Locke, Wade H. Morton, Horace C. Wilkinson, Wm. S. Pritchard, Winston McCall, Thos. Coleman and Bryant A. Whitmire, all of Birmingham, for appellees.

STAKELY, Justice.

The question for decision is whether the increase in the assessments of ad valorem taxes in this case is violative of the constitutional principal of uniformity of taxation. Nora Alice Adkins and three other taxpayers of Jefferson County seek by a bill in equity to enjoin the board of equalization, the tax assessor and the tax collector from making an alleged illegal increase in the assessment of taxes. Several thousand similarly situated taxpayers filed petitions for intervention, which have not been passed upon. The case was presented for temporary injunction upon bill, answer and affidavits. A temporary injunction was issued granting relief to all four complainants against the tax collector, but not against the tax assessor or board of equalization. J. W. Hamilton, as Tax Collector, brings this appeal from the foregoing decree.

Various reasons are advanced by the appellant as showing that the injunction should not have been issued, including for example the contention that injunction does not lie to restrain the collection of taxes, but we think that it is well to go to the heart of the inquiry and consider the case on its merits without considering or passing upon other questions. With this thought in mind we have concluded that the injunction should not stand.

It seems clear that the constitutional principle of uniformity of taxation may be infringed by the method of administration of a property tax statute, even though the statute is fair on its face. Discrimination in the assessment or valuation by administrative officers may result in violation of the equality clause of the Fourteenth Amendment to the Federal Constitution. Cumberland Coal Co. v. Board of Revision, 284 U.S. 23, 52 S.Ct. 48, 76 L.Ed. 146; Southern R. Co. v. Watts, 260 U.S. 519, 43 S.Ct. 192, 67 L.Ed. 375. Before this result can be reached, however, it is necessary that the action of the administrative officials be more than mere error in judgment or result in more than inequality in

valuation. It must be shown that the officials are chargeable with a purpose or design to discriminate by a systematic method. Sunday Lake Iron Co. v. Township of Wakefield, 247 U.S. 350, 38 S.Ct. 495, 62 L.Ed. 1154; Rowley v. Chicago & N. W. R. Co., 293 U.S. 102, 55 S.Ct. 55, 79 L.Ed. 222; Southern R. Co. v. Watts, supra; Greene v. Louisville & Interurban R. Co., 244 U.S. 499, 37 S.Ct. 673, 61 L.Ed. 1280, Ann.Cas.1917E, 88; Raymond v. Chicago Union Traction Co., 207 U.S. 20, 28 S.Ct. 7, 52 L.Ed. 78, 12 Ann.Cas. 757; Great Northern R. Co. v. Weeks, 297 U.S. 135, 56 S.Ct. 426, 80 L.Ed. 532; Penney v. State, 221 Ala. 230, 128 So. 596.

Careful consideration of the record, including the court's decree, shows that the case turns on the effect to be given a plan of tax equalization devised by the tax officials which is referred to as "the four year plan of review and revision of assessments." Under this plan Jefferson County is divided into four districts. Tax assessments on properties located in one district are reviewed and equalized in one year, with a like procedure in the other districts respectively in the three next succeeding years with the idea that at the end of four years all assessments in Jefferson County would have been reviewed and equalized. In 1946 the board of equalization reviewed and reappraised units of real property lying in the area known as Shades ·Valley. In 1947 the board of equalization reviewed and reappraised units of real property located for the most part in the district which is known as the Elyton Land Company's Survey. The properties of complainants lie in this segment of Jefferson County. It is claimed that the valuations are based on a general price increase throughout the county and that inequality results because valuations in the part of the county wherein the properties of complainants lie have been increased while the properties lying in other parts of the county have not been increased, except those properties lying in Shades Valley.

There is no doubt that the board of equalization has adopted a systematic plan for equalization over a four year period. This brings us to the design or intention with which the plan has been formulated. In this connection we quote from the answer of the respondents, especially since it shows the method used by the board of equalization.

"It is further averred that because of the large number of taxable units of property in Jefferson County and the large value of said property in Jefferson County which includes many industries and factories and plants, that it is a physical impossibility to review in one tax year the files of all of the taxable units of property in said County; and it is also a physical impossibility to make an on the spot inspection or appraisal of all of the units of taxable property in said County. It is possible to review in any one taxable year a portion only of taxable property in said county for the purpose of equalizing and appraising said property at its fair and reasonable market value. It is possible to review within any one taxable year approximately one-fourth of the taxable units of property within this County.

"The Board of Equalization began its work of reappraising and equalizing the assessments in this county in the tax year 1940 which began October 1, 1939. In that year and in each subsequent year, the Board by formal resolution has approved and adopted the 164,000 assessments which the tax assessor had set up on his books as the assessment for the current year in each of the said years, and the Board has assessed for taxation in each of the years since its creation in 1939 the entire 164,000 units of property in said County. The Board of Equalization in the tax year 1940 commenced the policy and the plan to equalize as speedily as possible all of the units of property in the said County at 60% of the fair and reasonable market values thereof. In furtherance of such plan, the said Board reviewed approximately 7,000 units of property in the Shades Valley area and the close-in downtown districts in Birmingham. This review of said property in Shades Valley and the downtown district of Birmingham was as much as it was physically possible for the Board to review in said tax year. This limitation upon the amount of review in said year was due to the limited size of

the Board and the restriction upon the number of employees and appraisers that could be employed by the Board. For the said tax year 1940, the Board equalized the said 7,000 units of property at 60% of the fair and reasonable market value thereof.

"In furtherance of its plan to equalize as speedily as possible all of the taxable units in said County, the Board in the tax year 1941, approved, ratified, and assessed the 164,000 units of property within the County and concurrently reviewed approximately 70,000 units of property in Birmingham, Leeds, Irondale, Tarrant and Warrior, and it was a physical impossibility for the Board to have reviewed more than the said 70,000 units of property in said tax year. The Board reviewed in said tax year as many units of taxable real property as it was physically possible to so review. Said review of said 70,000 units of property equalized the assessed value thereof at 60% of the fair and reasonable market value.

"In the tax year 1942, the said Board of Equalization, in furtherance of its plan to equalize as speedily as possible all of the property in said County, approved, ratified and assessed again said 164,000 units of property within said county, and concurrently reviewed approximately 47,000 units of property in Bessemer, Hueytown, Brighton, and the industrial plants between Bessemer and Ensley, and the mining districts on Red Mountain. It was a physical impossibility to have reviewed any more than said 47,000 units of property in said tax year. The Board of Equalization reviewed as much of the property within Jefferson County as it was physically possible to so review in said tax year. The 47,000 units in said year were equalized at 60% of the fair and reasonable market value thereof.

"In 1943 in furtherance of said plan to equalize said County as speedily as possible, said Board approved, ratified, and assessed said 164,000 units of property within said County for said tax year, and concurrently reviewed and reappraised the remaining 40,000 units of taxable real property in said County most of which units lay in Ranges 3, 4, 5, 6, 7 and 8. The

Board of Equalization reviewed as many units of property in said tax year as it was physically possible to review. Said 40,000 units for said year were equalized at 60% of the fair and reasonable market value thereof.

"The entire County of Jefferson and all of the real property thereof was reviewed and equalized within said four-year period from the tax year 1940 through the tax year 1943.

"In 1946 six years after its original commencement of equalization and appraisal, the Board commenced a review and equalization of the entire County for the second time. The Board ratified, approved and assessed the 164,000 units which the Tax Assessor had set up for said current year, and concurrently reviewed and reappraised and equalized approximately 7,000 units of real property in Shades Valley. This review and reappraisal was for the purpose of equalizing at 60% of its fair and reasonable market value said 7,000 units of property; and said 7,000 units were equalized at 60% of the fair and reasonable market value thereof. It was a physical impossibility for the Board to review in said tax year 1946 more than the 7,000 units of property in said Shades Valley. In said tax year 1946, the Board reviewed and reappraised all of the property that it was physically possible to so review and reappraise and equalize in said tax year. This review and reappraisal in said Shades Valley was a part of the plan of the Board to equalize as speedily and thoroughly as possible all of the real property in said County at 60% of its fair and reasonable market value.

"In the tax year 1947, the Board in furtherance of its plan to equalize as speedily and thoroughly as possible the entire County, ratified, approved and assessed the 164,000 units which the Tax Assessor had set up for said year and concurrently reviewed and reappraised and equalized approximately 28,000 units of real property in the city of Birmingham, and in certain sections South of Birmingham in Range 2, and in various sections of the entire County. Of said 28,000 parcels approximately 20,000 were increased in assessed value in amounts ranging from 10% to 60% and

approximately 4,000 units of said 28,000 units were left unchanged in assessed value, and approximately 4,000 units of said 28,000 units were situated in all sections of Jefferson County and were increased in assessed value because of new buildings, additional improvements, and installations which justified an increase in the fair and reasonable market value thereof. It is averred that all of said 28,000 units were equalized at 60% of the fair and reasonable market value thereof, and that it was a physical impossibility for said Board to have reviewed and reappraised more than said 28,000 units of property. The Board reviewed and reappraised and equalized as much of the said County as it was physically possible to do in said year. It is averred that the Board and said respondents as a part of its plan to equalize as speedily and thoroughly as possible said County, propose and intend for the tax year 1948 to review and equalize as much of said County as is physically possible so to review and equalize, which will probably consist of approximately 47,000 units in Bessemer, Hueytown, Brighton, and the industrial plants between Bessemer and Ensley, and the mining districts on Red Mountain, and remaining units in Birmingham.

"For the tax year 1949 the said Board and the respondents propose and intend to review and equalize any portion of the County which it may not have finished in said year 1948. It is probable that for the tax year 1949 the Board of Equalization will review and equalize approximately the 40,000 remaining parcels in the County most of which lie in Ranges 3, 4, 5, 6, 7 and 8. It is averred that the Board of Equalization and the respondents working full time during the entire year and making use of all of the employees and appraisers authorized by law cannot review and equalize the entire property in said County in less than four tax years. That the plan and policy of said Board and said respondents, have been to review and equalize and complete said work of reviewing and equalizing said entire County within a term of four years, and that there is not and has not been any plan or intent to systematically or intentionally discriminate or otherwise discriminate against any area of said County or class of taxpayers or class of property within said County."

As we have pointed out mere inequality in valuation does not contravene constitutional provisions. The court found and we think correctly so, that there was no fraud, no bad faith nor evil design on the part of the board of equalization. The court further found, and we think correctly so, that the board of equalization sincerely believed that it was following a permissible plan. We quote further findings by the court from the decree of the court as follows:

"* * * It is also due to be noted that none of the complainants assert that their respective properties have been assessed at a sum greater than sixty percent of the fair and reasonable market value thereof. Their complaint is simply that the four-year plan gives them an assessed valuation which is a measurably higher percentage of the fair and reasonable market value of their properties than that which is given the properties of numerous other taxpayers in those segments of the county which the Board of Equalization expects to reach for review and revision with(in) the next two years. * * *."

While there are affidavits showing that the owners of various properties were told that the increase in valuation was not due to any increase in value of their particular property but was being made because of a general increase in property values throughout the county, the allegations of the answer show that of 24,000 increased assessments, 4,000 thereof were increases in valuation due to the construction of new houses or buildings or additions or improvements to houses or buildings, all of which have been made since October 1, 1945, which materially increased the value and reasonable market value of such units. The aforesaid 24,000 increases in assessments were not made under any arbitrary or fixed percentage of increase but were fixed with regard to the increase in value of each particular unit and varied from 5% to 60%. In the appraisal program for 1947 the board of equalization examined at least 4,000 additional properties in

which they found there had been no increase in value and on which they made no increase of assessments.

How can there be a design or intention to discriminate when the board of equalization in all of its working time does all that it can humanly do? We think the record shows that it takes four years to review and reappraise all of the taxable units in Jefferson County. How can there be a design or intention to discriminate just because the review and reappraisal are not done in less time than men are physically able to do the job? Assuming for the sake of argument that there is the vice of discrimination in the four year plan, it's a fair question to ask how the vice can be removed? When the four year plan was completed in 1945, the board of equalization might have refused to make further reviews and appraisals. This obviously would make a mockery of the function of the board of equalization. More employees might be hired in order to make the equalization in one year. This is not a matter with which the board of equalization can be charged. It employed all the help allowed by law. Under the circumstances the four year plan was born of necessity and at the worst contemplates complete equalization at the end of four years. Any inequality is merely temporary. As we shall see when the review is merely partial, temporary and made in good faith, this tends to show lack of intention to discriminate.

But it is argued that § 217 of the Constitution of Alabama of 1901 makes no allowance for time or for either the convenience or physical powers of men. We quote the section as follows:

"The property of private corporations, associations, and individuals of this state shall forever be taxed at the same rate; provided, this section shall not apply to institutions devoted exclusively to religious, educational, or charitable purposes."

In connection with § 217 we should also consider § 211 of the Constitution of 1901 in pertinent part as follows:

"All taxes levied on property in this state shall be assessed in exact proportion to the value of such property, * * *."

We are not cited by the appellees to any cases construing § 217 and the court does not mention these sections in its decree. There is a misapprehension as to the meaning and purpose of § 217. Section 217 refers to the rate of taxation upon property of private corporations, associations and individuals. The rate of assessment in this state is sixty percent of the fair and reasonable market value, as required by § 211. Under § 211 assessments must be in exact proportion to the value of the property. After the assessment has been made the rate of taxation is then applied and the rate must be the same except as provided in § 217. There is no difference in the rate of taxation in the present case. The difference lies in valuation.

Sections 211 and 217 are aimed at securing a practical and common sense equality in taxation. Exact equality is not to be expected nor is it required. In Moog v. Randolph, 77 Ala. 597, the court in referring to these two sections as they appear in the Constitution of 1875, said:

"It is settled that the general purpose of these clauses is to establish an ad-valorem system of taxation, thus exacting a certain kind of uniformity in the rules of taxation, as applied to the property of all persons, whether private or artificial. Sections similar in phraseology and signification, are found in the constitutions of some of our sister States. Their object has been construed to be, to secure, as far as practicable, that equality in bearing the just burdens of government, which has become a distinguishing characteristic of the American States, and has been well denominated the corner-stone of Anglo-Saxon liberty. These clauses have never been construed to exact the taxation of all property, of every description, in the State, at precisely the same rate of taxation, without regard to its peculiar nature, uses, or other characteristics. * * *." 77 Ala. at page 602.

If it were or had been the law of this state that a mere inequality in assessed values of property violated these sections, it would have held that the tax valuation of other property is admissible on the trial of the assessed valuation of a

particular piece of property. But it is well settled in this state that·the tax valuation of other property is inadmissible unless there is shown to be an " 'intentional and systematic' valuation of property below its real value." Penney v. State, 221 Ala. 230, 128 So. 596, 598. But for the sake of the record it is a mistake to think that these sections are exactly equivalent to an equal protection clause. The equal protection clause in the Constitution of 1875 was dropped from the Constitution of 1901. McLendon v. State, 179 Ala. 54 (58), 60 So. 392, Ann.Cas.1915C, 691. In other words the right of any of the appellees to be protected against discrimination under the state constitution must be rested on lack of due process and the general idea of uniformity rather than on an express provision for equal protection. McLendon v. State, supra.

The Penney case, supra, cites several Alabama cases as holding the inadmissibility of the tax valuation of other property in a proceeding to assess a particular parcel of property. In one of these, Alabama Mineral Land Co. v. Commissioners' Court, 95 Ala. 105, 10 So. 550, 551, the court said,

"In determining the valuation at which the appellant's property should be assessed for taxation, it is immaterial to inquire whether or not other property has been fairly valued, for the fact that undervaluations have been permitted in many instances would afford no excuse for the assessment of the appellant's property at less than its 'fair market or real value.' A neglect of the requirements of the law in this case could not be excused by showing a similar breach of duty in other cases. There may be a remedy to prevent unjust discrimination in the valuation of property for taxation, but the fact that the property of others has been undervalued could not justify a corresponding undervaluation of the property of the appellant."

██ To sum up the situation, the effect of the equal protection clause of the Federal Constitution and state uniformity requirements are substantially similar and what violates the one will contravene the other. 51 Am.Jur. § 169, p. 225. In short there must be a systematic and intentional discrimination before the state constitution is violated. A study of some of the authorities in other states will bear out this statement.

In Newport Mining Co. v. City of Ironwood, 185 Mich. 668, 152 N.W. 1088, 1095, the court construed § 7, Article 10, of the Michigan Constitution which required: "All assessments hereafter authorized shall be on property at its cash value." The court required an intentional inequality before this provision is violated. It held: "While exact equality in taxation can never be achieved, intentional inequality of assessment invalidates the tax."

In 22 Charlotte, Inc., v. City of Detroit, 294 Mich. 275, 293 N.W. 647, 652, the same Michigan constitutional provision requiring all assessments to be made· at cash value was relied upon. But the court required "an intentional and arbitrary discrimination."

In Wild Goose Country Club v. Butte County, 60 Cal.App. 339, 212 P. 711, 715, it is stated by the California Court on rehearing in referring to an exact equality of taxation:

"If such were the law, but few assessments could be upheld, because absolute equality in the assessment of thousands of parcels of land is impossible of accomplishment. 'Unless it is shown that the undervaluation was intentional and systematic, unequal assessment will not be held to violate the equality clause.' "

City of Roanoke v. Gibson, 161 Va. 342, 170 S.E. 723, 726. The state constitution, §§ 169 and 168, required assessments to be at market value and uniform. An assessment was made against the taxpayer, which assessment was "to continue in force for four years." Such assessment was upheld, and it was stated that a systematic and intentional discrimination was necessary to be shown before the assessment was invalidated. The fact that other lands were assessed below market value was held to be immaterial. The court made this pertinent statement,

"Since these assessments rest in the opinion of men, exact equality is an impossible standard."

██ We have pointed out that where there is a review of only a portion of the

real estate in the county done in good faith and looking to a plan to equalize values of all property as promptly as possible, this should be considered on the question of intentional discrimination. In the case of Newport Mining Co. v. City of Ironwood, supra, the state tax commission for the year 1911, in Gogebic County, reviewed mining property only and did not review other types of property. Mining property was substantially increased in assessed value for the year 1911, but no other class of property was changed in assessed value. In the following year, 1912, non-mining property was reviewed and substantially increased in value.

The mining company contested the increased assessment for 1911 upon it. It argued that the increase against it was fraudulent because the rest of the property of the county was undervalued. The court said:

"The argument that property, generally, in the state was underassessed in 1911, and that the property of plaintiff (mining company) was therefore relatively and fraudulently overassessed, is answered, I think, by the statement that, admitting there was a general condition which needed to be remedied, the remedy had to be applied in detail and not generally, unless the last condition was to be made worse than the first."

In short taxing authorities must commence somewhere in the county with some class of taxpayer in order to equalize the entire county.

The court then stated an argument made by the company that is the argument made by the appellees in the case at bar.

"There is more force to the argument that, having entered a district for the purpose of applying the remedy, it should have been applied to all property, and not to mining property alone. The argument considerably disturbed the trial court, as appears from his charge. The reason assigned by the Board for not generally reviewing the assessment rolls was lack of time. No one can tell what it might have done had a review been attempted."

One of the mining companies in Michigan for the same year 1911 carried its case to the United States Supreme Court and urged that its assessment should be revised on the ground of a denial of the equal protection of the law. The United States Supreme Court denied relief to the mining company. Sunday Lake Iron Co. v. Township of Wakefield, 247 U.S. 350, 38 S.Ct. 495, 62 L.Ed. 1154. The facts were practically the same in the case before the Michigan Supreme Court and the United States Supreme Court because both appeals arose out of the review of mining property only in said state for 1911. The United States Supreme Court said:

"The record discloses facts which render it more than probable that plaintiff in error's mines were assessed for the year 1911 (but not before or afterwards) relatively higher than other lands within the county although the statute enjoined the same rule for all. But we are unable to conclude that the evidence suffices clearly to 'establish that the state board entertained or is chargeable with any purpose or design to discriminate. Its action is not incompatible with an honest effort in new and difficult circumstances to adopt valuations not relatively unjust or unequal. When plaintiff in error first challenged the values placed upon the property of others no adequate time remained for detailed consideration nor was there sufficient evidence before the board to justify immediate and general revaluations. The very next year a diligent and, so far as appears, successful, effort was made to rectify any inequality. * * *"

Wild Goose Country Club v. Butte County, 60 Cal.App. 339, 212 P. 711. The taxpayer alleged a fraudulent discrimination on the part of the board in raising the assessed value of his lands by failing to raise the value of other lands in the vicinity. The board stated that it did not have time to review and raise adjacent lands, but that in the following year this was done. The court held that there did not exist a fraudulent discrimination and it affirmed the increase of the taxpayer's assessment. The action of the board in good faith in equalizing the property of the district as soon as time and circumstances permit negatived the existence of a fraudulent discrimination.

566

In People v. Orvis et al., 301 Ill. 350, 133 N.E. 787, 788, 24 A.L.R. 325, there was involved a state constitutional provision of Illinois, § 1, Art. 9, Smith-Hurd Stats., which provided:

"The general assembly shall provide such revenue as may be needful by levying a tax, by valuation, so that every person and corporation shall pay a tax in proportion to the value of his, her or its property— such value to be ascertained by some person or persons, to be elected or appointed in such manner as the general assembly shall direct, and not otherwise; * * * in such manner as it shall from time to time direct by general law, uniform as to the class upon which it operates."

The Illinois Supreme Court stated that this provision is a mandate "to taxing authorities to require uniformity of taxation." A thirty percent horizontal raise of an entire district of a county was held not to violate this section, even though the rest of the county was left unchanged. The court stated:

"* * * the board of review did not take any action with reference to equalizing the assessments of any other taxing district in Lake county, * * *."

See also City of Roanoke v. Gibson, 161 Va. 342, 170 S.E. 723; First Nat'l. Bank v. Patterson, 65 Colo. 166, 176 P. 498; Bunten v. Rock Springs Grazing Ass'n, 29 Wyo. 461, 215 P. 244; Greene et al. v. Louisville & Interurban Co., 244 U.S. 499, 37 S.Ct. 673, 61 L.Ed. 1280, Ann.Cas.1917 E, 88; Alfred J. Sweet, Inc., v. Auburn, 134 Me. 28, 180 A. 803, 104 A.L.R. 784; Lubbock Hotel Co. v. Lubbock Independent School Dist., Tex.Civ.App., 85 S.W. 2d 776.

We conclude that there was no intentional discrimination.

In keeping with the views here expressed the court will enter an order dissolving the temporary injunction.

Reversed, rendered and remanded.

All the Justices concur, except LAWSON, J., who dissents.