523 P.2d 97

**Malcolm L. HILLOCK and Beverley C. Hillock, husband and wife, Appellants and Cross Appellees,**

**v.**

**Jack E. BADE, Pima County Assessor; James Lee Kirk, Pima County Treasurer; Dennis Weaver, Thomas S. Jay and James J. Murphy, as members of the Board of Supervisors of Pima County, Arizona; Pima County, Arizona, a body politic; Pima County Board of Equalization; Board of Equalization of the State of Arizona; Arizona State Board of Property Tax Appeals; and State of Arizona, a body politic, Appellees and Cross Appellants.**

**No. 2 CA–CIV 1459.**

Court of Appeals of Arizona, Division 2.

June 6, 1974.

Rehearing Denied July 15, 1974.

Review Granted Sept. 24, 1974.

Hillock & Richards by Malcolm L. Hillock, Tucson, for appellants and cross appellees.

Gary K. Nelson, Atty. Gen., by James D. Winter, Asst. Atty. Gen., Phoenix, for appellees and cross appellants.

## OPINION

HAIRE, Presiding Judge.

On this appeal the appellant-taxpayer complains because the trial judge, after finding that the Pima County cyclical revaluation plan[1] being utilized by the appellee-assessor was unconstitutional, nevertheless denied any refund to the taxpayer, finding that any such refund would work a great and undue hardship on the governmental entities involved. *See* Southern Pacific Co. v. Cochise County, 9 Ariz. 395, 377 P.2d 770 (1963). The appellees, herein sometimes collectively referred to as the taxing authorities, have filed a cross-appeal contending that the Pima County cyclical revaluation plan was not unconstitutional, and that the trial judge should not have granted any relief whatsoever to the appellant-taxpayer.

▮ Initially, some comment must be made concerning the procedural route by which this appeal reached this Court. Ostensibly, the trial judge entered his final judgment as a result of the taxpayer's mo-

---

1. The Pima County cyclical revaluation plan is described in detail in a subsequent portion of this opinion.

tion for summary judgment. The record upon which this "summary" judgment was entered is somewhat complicated by the fact that the trial judge, apparently without objection from any party, took judicial notice of the entire record in a related case.[2] From a review of the pleadings, depositions, affidavits and testimony found in the combined records, it is evident that the record does contain several issues of material fact which would ordinarily preclude the disposition of this matter under summary judgment procedures, especially if the affidavits submitted by the taxpayer can be considered to·be in compliance with Rule 56(e), Rules of Civil Procedure, 16 A.R.S. However, we are of the opinion that this appeal should not be disposed of on this procedural issue, since we are convinced from the record as a whole that in actuality the trial judge, with the taxpayer's consent, resolved all fact issues in favor of the taxing authorities. Thus the taxing authorities are in no position to complain that the judgment went against them on this favorable factual resolution. From the taxpayer's answers to interrogatories, his memoranda filed in the trial court, and briefs filed in this Court, it is obvious that he had no additional evidence to submit, and that he acquiesced in the course adopted by the trial judge. In fact, lest there be some misinterpretation of our remarks, we hasten to add that the *taxpayer* did not, either in the trial court or on this appeal, complain of the summary judgment procedure utilized by the trial judge, and recognizes and accepts the resolution of factual issues against him. It is the *taxing authorities* who have complained, both here and in the trial court, of the disposition of this matter by purported summary judgment procedures. However, in view of the fact that the trial judge resolved all factual issues in their favor, and

in view of the decision which we have reached on the substantive issues involved in the taxing authorities' cross-appeal, we do not consider prejudicial any alleged violations of the taxing authorities' procedural rights.

The taxpayer filed his complaint in the Pima County Superior Court seeking a refund of a portion of certain real property taxes imposed and collected by the defendant taxing authorities for the year 1971. The essence of his complaint was the contention that the Pima County cyclical revaluation program violated the tax uniformity clause of the Arizona constitution, and the due process and equal protection clauses of both the Arizona and United States constitutions. This contention is based on the assertion that the cyclical program resulted in an intentionally discriminatory and unequal increase in the valuations and assessments placed upon his residential property for the 1971 tax year as compared to the valuations and assessments placed upon other similar properties of the same classification for the same tax year.

The complaint characterized the purportedly objectionable features of the Pima County revaluation program as "trending". However, with the development of the litigation, it became apparent that the actual complaint was not directed to the trending feature of the program, but rather to the *cyclical* nature of the revaluation scheme.[3] The taxpayer did not contend that his property had been valued in excess of its market or full cash value, but rather complained of discriminatory valuation practices allegedly violative of the principles established by the Arizona Supreme Court in McCluskey v. Sparks, 80 Ariz. 15, 291 P.2d 791 (1955); Sparks v. McCluskey, 84 Ariz. 283, 327 P.2d 295 (1958); and

2. Pima County No. 133545, which is the subject of this Court's decision, Dodson v. Bade, et al., 2 CA–CIV 1460, filed contemporaneously herewith.

3. The word "trending" is generally used in the appraisal field to describe a technique

for updating valuations which have been made on a reproduction cost basis. By the use of factors which have been developed through research, the effect of some influences on the market, such as inflation, can be computed and thus the present market value can be determined.

Southern Pacific Co. v. Cochise County, *supra*.

The taxpayer's claim of illegal discrimination must be evaluated against the background of Arizona's statutory scheme relating to the valuation for assessment purposes and the taxation of real and personal property. The Department of Revenue (formerly the Department of Property Valuation) is responsible for the statewide annual valuation of many types of property, the principal classifications of which include producing mines, mills and smelters; gas, water and electric utilities; pipelines; flight property; and railroads. *See generally*, A.R.S. §§ 42–124, 42–124.01, 42–704 and 42–762. Each county assessor is given the responsibility of determining the valuation of all property in his county subject to taxation and not otherwise provided by law to be valued by the Department of Revenue. *See* A.R.S. § 42–221. Thus the county assessor is primarily concerned with the valuation of residential, agricultural and general commercial properties. The statutes require that both the Department of Revenue and county assessor valuations be at "full cash value" which is synonymous with market value. *See* A.R.S. §§ 42–201(7) and 42–227. For the purpose of insuring that properties throughout all fourteen counties of the state are uniformly valued, the county assessors are subject to supervision and regulation by the State Department of Revenue in the performance of their valuation and assessment functions. *See* A.R.S. § 42–123.

In order to determine the "assessed valuation" against which the tax rate is applied to determine the dollar amount of the tax, property is divided into five classifications, ranging from residential property at 18% of full cash value, to railroad and mining properties at 60% of full cash value. *See* A.R.S. §§ 42–136, 42–227.

■ The foregoing statutory scheme, including the property classification provisions and that portion dealing with the establishment of the Department of Revenue, with its valuation and county assessor supervisory functions, is a direct outgrowth of the Arizona Supreme Court's decision in Southern Pacific Co. v. Cochise County, *supra*. The primary purpose of the Department's supervisory powers over the county assessors is to bring about and keep in effect an up-to-date uniform valuation of all property throughout the state, regardless of the county in which it might be located.

In order to establish some initial semblance of uniformity, the legislature in 1964 mandated statewide revaluations, to be placed on the assessment rolls for the year 1968. Thereafter, subject to supervision by the Department of Revenue, each county assessor had the duty of keeping the valuations current, a difficult task in some counties in view of rapid growth and inflation problems.

Against this background we now proceed to consider the Pima County assessor's cyclical revaluation program which is the subject of the taxpayer's complaint. Prior to 1971, the Pima County assessor continued to use the valuations which were determined in the statewide revaluation program carried out between 1964 and 1967, and placed on the assessment rolls in 1968. By 1970, as the result of inflation, these 1968 valuations no longer represented full cash value. Therefore, the director of the Department of Property Valuations (now a part of the Department of Revenue), in the exercise of his statutory powers to supervise and regulate the valuation policies of the various county assessors, ordered the county assessors to update the valuations of properties within their counties.

The Pima County assessor set about to comply with this order by instituting a plan for revaluation of all assessor-valuated property with Pima County over a three year period.[4] The 150,000 parcels in Pima

---

4. The term *"all* assessor-valuated property" is not completely accurate. It is necessary to bear in mind that considerable residential and commercial property had been developed in Pima County subsequent to 1967. The record discloses that as these newly developed

County were to be revalued in the order of the parcel numbers. The lowest numbered parcels would be revalued first and the highest numbered parcels would be revalued last.

Under this cyclical revaluation program, one-third of the parcels were to be put on the tax rolls with the new valuations by January 1, 1971; a second third would be put on the tax rolls by January 1, 1972; and the final third was to be put on the tax rolls at the new valuations by January 1, 1973. In accordance with this plan, approximately one-third of the properties were put on the tax rolls at the new valuations on January 1, 1971 and approximately another third were placed on the tax rolls at the new valuations on January 1, 1972. At the time of the hearing, it appeared probable that the final one-third would be placed on the tax rolls by January 1, 1973, thereby completing the program on schedule.

The record establishes that during the times pertinent to this decision, the staff of the Pima County assessor's office was maintained at the maximum level permitted by the appropriations of the Board of Supervisors, and that the staff and facilities of the assessor's office were inadequate to have completed this revaluation work within one year. It was further established that even if appropriations had been available, this revaluation program could not have been completed in less than three years because there were not sufficient facilities to house additional personnel or sufficient time to train such personnel to complete the program in a shorter time period.

The record also established that after the 1968 revaluation, market values of residential and commercial properties were increasing at a rate of approximately 8% to 10% a year. Therefore, in 1971 when the Pima County assessor placed the new valuations for the first one-third of the prop-

erties on the tax rolls, these valuations were in general 32% to 40% higher than the 1968 valuations on those county-assessor valued properties which had not been revalued subsequent to 1968. The plaintiff-taxpayer's residence was in the first one-third of the Pima County properties, and its valuation was likewise substantially increased.

Recognizing that under the circumstances the Pima County assessor could not possibly have completed the revaluation of all the pertinent parcels within one year, the taxpayer contended that the appropriate solution would have been to wait until the completion of all reappraisals under the three year revaluation program, and then put such revaluations on the assessment rolls so that all would become effective at the same time.

In opposition to this proposed solution, the taxing authorities contended that such a solution presented many inequities and problems, and that under all the circumstances the approach adopted by the taxing authorities was reasonable and did not constitute arbitrary discrimination against the plaintiff-taxpayer. The taxing authorities emphasized that the problem could not be considered by focusing on Pima County alone, but rather, must be considered in relation to the statewide valuation and assessment scheme which has previously been described in this opinion; that because Pima County was lagging behind other counties which were able to implement their revaluation plans annually, the outdated values in Pima County gave an unfair advantage to Pima County taxpayers over the owners of property in all other counties within the state (except in Maricopa County where a similar three year program was necessary), and that the approach proposed by the taxpayer would only accentuate and increase this already existing unfair advantage. The taxing au-

---

properties came into existence, as well as at the time new improvements on previously developed properties were made, up-to-date valuations were entered on the Pima County assessor's rolls, and to this extent a consid-

erable portion of the assessor-valuated property in Pima County was, in 1971, on the rolls at values in excess of the general levels of the 1968 valuation.

thorities further pointed out that because a great portion of the properties in Pima County were centrally assessed (by the State Department of Property Valuations) on an annual basis, and thus presumably carried up-to-date valuations, the plaintiff-taxpayer already enjoyed an unfair undervaluation as compared to the centrally assessed properties situated in Pima County, and the additional delay of three years advocated by the plaintiff-taxpayer would again further increase this inequity. In addition to centrally assessed properties in Pima County which carried up-to-date valuations, the taxing authorities also noted that many subdivisions, individual residences, and commercial improvements constructed in Pima County subsequent to 1968 were also carried on the rolls at relatively up-to-date valuations when compared to the valuations placed on the rolls in 1968.

As a final point, the taxing authorities urged that a basic misapprehension underlying plaintiff-taxpayer's contention was his false assumption that when all properties in the state were completely revalued for the 1968 tax rolls, a common level of equal assessment was established.[5] In actuality, under the 1964–1967 revaluation program, those parcels assessed at earlier dates had assessments which did not reflect the effects of inflation as much as the later assessments did. The first parcels to be revalued in the Pima County cyclical revaluation program were the same as those first revalued in the 1964–1967 program, and the revaluation proceeded in like sequence. The taxing authorities argued that revaluing in this sequence would tend to off-set to some degree the continuing advantage which the earlier assessed properties, such as that owned by the plaintiff-

taxpayer, had enjoyed during the period extending from 1968 to 1971.

We now consider two Arizona decisions which the taxpayer contends require a decision in his favor. In the first decision, McCluskey v. Sparks, 80 Ariz. 15, 291 P.2d 791 (1955), the trial judge had dismissed the complaint filed by a group of specific taxpayers. On appeal the Arizona Supreme Court held that the complaint stated a cause of action, stating:

> "Deliberate and systematic undervaluation of plaintiffs' property at a figure greatly in excess of the undervaluation of other like properties amounts to a violation of the Arizona constitution, article 9, section 1, which requires that all taxes 'shall be uniform upon the same class of property within the territorial limits of the authority levying the tax * * *' and offends the equal protection clause of the Fourteenth Amendment to the constitution of the United States." 80 Ariz. at 19, 291 P.2d at 792.

In essence the McCluskey complaint had alleged that a small fraction of the total properties in Maricopa County were singled out and assessed by an entirely different method than the rest, which method increased their assessed values from 300% to 1600%. The taxpayers' complaints had been brought to the attention of the County Board of Equalization which had refused to act.

After remand, the matter was tried, resulting in a verdict for the plaintiff-taxpayers, and the defendant taxing authorities appealed. See Sparks v. McCluskey, 84 Ariz. 283, 327 P.2d 295 (1958). Upon this second appeal, the taxing authorities asserted the contention that the alleged discrimination was part of a program to bring

5. If the 1964–1967 valuations had been placed on the rolls at the time each particular revaluation was made rather than en masse in 1968, all types of property, whether residential, agricultural, commercial, mining, or railroads would have been taxed based upon a full cash value assessment. To avoid such a result, which was exactly what Arizona's

then existing statutes required (*see* Southern Pacific Co. v. Cochise County, *supra*), the legislature delayed placing the new valuations on the rolls in order that classification legislation allowing different percentages for different classes of property might be considered and enacted. *See* A.R.S. §§ 42–136 and 42–227.

all valuations in Maricopa County up-to-date. In considering this contention, the Arizona Supreme Court stated:

"The evidence does not indicate how many years might elapse before the program would be complete and equalization effected. We cannot subscribe to the proposition that grossly inequal values by the use of a specific method of assessment may be placed on a small portion of a class of property and remain subject to the disproportionately excessive value for an indefinite number of years in the future until the taxing officials can get around to using the same method upon the other like properties." 84 Ariz. at 287, 327 P.2d at 297.

We are of the opinion that the McCluskey decisions, *supra,* do not foreclose this Court from considering whether the temporary existence of differences in valuations which result from a systematic and definite revaluation plan such as that here involved, constitutes discrimination of a nature violative of the uniformity and equal protection clauses of the Arizona constitution. The Arizona Supreme Court's comments in the second McCluskey decision, quoted above, indicate an awareness that an entirely different result might have been forthcoming if the evidence had shown that a definite and logical plan of revaluation to be executed in a reasonably limited time had been involved.

In this respect, the Arizona Supreme Court's opinion is in total harmony with the following authorities which have upheld reasonable plans for revaluation even though not completed within one tax year. Hamilton v. Adkins, 250 Ala. 557, 35 So.2d 183 (1948); Rogan v. County Commissioners of Calvert County, 194 Md. 299, 71 A. 2d 47 (1950); Carkonen v. Williams, 76 Wash.2d 617, 458 P.2d 280 (1969); May

Department Stores v. State Tax Commission, 308 S.W.2d 748 (Mo.1958); Skinner v. New Mexico State Tax Commission, 66 N.M. 221, 345 P.2d 750 (1959); Lord v. County of Marin, 214 Cal.App.2d 25, 29 Cal.Rptr. 248 (1963); Barnes v. Dale County Board of Equalization, 283 Ala. 437, 218 So.2d 150 (1969); Johnson v. County of Ramsey, 290 Minn. 307, 187 N. W.2d 675 (1971).

The foregoing cases involve clauses similar to the uniformity of taxation[6] and equal protection[7] clauses of the Arizona constitution, which are found in the constitutions of most states. *See* 71 Am.Jur.2d, State and Local Taxation § 159. Many of these decisions are collected in an A.L.R. annotation entitled "Real estate tax equalization, reassessment, or revaluation program commenced but not completed within the year, as violative of constitutional provisions requiring equal and uniform taxation", 76 A.L.R.2d 1077 (1961). The annotator summarizes the decisions as follows:

"The cases disclose a strong inclination to disallow the claim that a violation of constitutional right to equality and uniformity in taxation results from inequalities and maladjustments consequent on the inability of assessors and reviewing and equalizing officers to complete within a single tax year a projected program for the reassessemnt of the lands of a given county or other tax district. Thus far all claims of violation of constitutional right by reason of the element of time above indicated have been rejected, including those made in cases in which the result of temporary non-completion of the program was to cause some lands of the tax area to be for the time being assessed at new and higher valuations, with or without changes in tax rates, while other lands not yet

---

6. Art. 9, § 1 of the Arizona Constitution, A. R.S., reads, in part, as follows:
   "All taxes shall be uniform upon the same class of property within the territorial limits of the authority levying the tax, and shall be levied and collected for public purposes only."

7. Art. 2, § 13 of the Arizona Constitution reads as follows:
   "No law shall be enacted granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which, upon the same terms, shall not equally belong to all citizens or corporations."

reached were assessed at old and glaringly contrasting values." 76 A.L.R.2d at 1077.

*See also,* 72 Am.Jur.2d, State and Local Taxation, § 799, p. 117 (1974).

The case of Hamilton v. Adkins, *supra,* is particularly in point. In dealing with the Alabama constitutional principle of uniformity of taxation, the Alabama court noted that such uniformity provisions are substantially identical in intent and purpose to equal protection clauses.[8] The facts in the Alabama case showed that under a plan of tax equalization devised by the tax officials, Jefferson County was divided into four districts, whereby tax assessments on property located in one district were reviewed and equalized in one year with a like procedure in the next three districts respectively the next three succeeding years with the idea that at the end of all four years, all assessments in Jefferson County would have been reviewed and equalized. The record indicated that it was a physical impossibility to review in one tax year the files of all tax parcels in the county and that approximately one-fourth of the taxable units of property within the county could be valued during a given year. The court held that in order to show a uniformity of taxation violation, there must be a showing of intentional and arbitrary discrimination, and that "where there is a review of only a portion of the real estate in the county done in good faith and looking to a plan to equalize values of all property as promptly as possible, this should be considered on the question of intentional discrimination."

We agree with the Alabama court that in considering whether a revaluation plan adopted by taxing authorities violates constitutional uniformity and equal protection clauses, the issue is whether the operation of the plan would consti-

tute intentional and arbitrary discrimination. In this regard the court should take into consideration all relevant circumstances, including the resources realistically available to the assessing authorities, the time limitations involved in the plan, and other available alternatives. The amount of the temporary inequality in valuations resulting from the cyclical implementation of the plan would also be a factor to be considered.[9] In addition, the inverse discrimination which might otherwise result or be prolonged from nonimplementation of the plan should be given great weight in the court's determination.

Applying the above considerations to this case, it is our opinion that the Pima County cyclical revaluation plan did not involve intentional and arbitrary discrimination, and thus did not violate any of the taxpayer's constitutional rights.

It is unquestioned that under the resources realistically available to the assessor, the required revaluation could not have been accomplished within one year. The plan did not involve an indefinite time period for its execution, as was the case in Sparks v. McCluskey, *supra,* but rather was closely structured and programmed for completion in three years, and in fact was actually completed within that time. Under the circumstances a shorter time schedule could not have been met. Several of the cases previously cited herein have involved approved cyclical programs of longer duration. *See* Hamilton v. Adkins, *supra;* Rogan v. County Commissioners of Calvert County, *supra;* and Carkonen v. Williams, *supra.*

Of course other alternatives were available, such as the taxpayer's contention (apparently adopted by the trial judge) that the taxing authorities should have waited until the completion of the three year revaluation program so that *all* new

---

8. *See also,* 51 Am.Jur. Taxation § 169, p. 225 (1944).

9. The "grossly unequal values" criticized by the Arizona Supreme Court in Sparks v.

McCluskey, *supra,* involved increases in valuations ranging from 300% to 1600%, as compared to the approximately 32% increase here involved.

**54**

valuations could be placed on the assessment rolls at the same time. However, this suggested alternative would only result in a prolongation of the inverse discrimination already being enjoyed by the plaintiff-taxpayer at the expense of many of the other taxpayers of Pima County as well as substantially all of the taxpayers from the other counties in the state. In this connection, while the plaintiff-taxpayer perceives his "class" for discrimination purposes to be comprised exclusively of other residential property taxpayers residing in Pima County, it is clear that insofar as concerns his claim of discriminatory valuation practices, the relevant class under the Arizona statutory valuations scheme cannot be so simply delineated. His discrimination claim must be viewed in a context involving *all* property situated in the State of Arizona subject to *ad valorem* property taxation. There is only one valuation for assessment purposes, and this single valuation, whether made by a county assessor or by other state assessing authorities, determines the value of that property for multiple taxing district purposes. There is no separate valuation for state tax rate purposes, no separate valuation for city or town tax rate purposes, and no separate valuation for school district purposes. The combined tax rate of all taxing districts having taxing jurisdiction over the property involved is applied against the single valuation. Therefore to the extent that any particular type of property is undervalued, there is discrimination against all other property within the state, not just against property of that particular class within the particular county involved. When these circumstances are considered, we do not believe that the taxing authorities acted arbitrarily in adopting a cyclical three year plan requiring that the new valuations be placed on the assessment rolls yearly as developed, rather than waiting until all of the new valuations could be placed upon the rolls at the same time at the completion of the three year program.

The judgment entered by the trial court is reversed and the matter remanded with directions to enter judgment in favor of the appellee-cross-appellant taxing authorities.

EUBANK, J., and JACOBSON, Chief Judge, Division 1, concur.

NOTE: This cause was decided by the judges of Division 1 as authorized by A. R.S. § 12–120, subsec. E.